**McGUIRE v CINCINNATI (city) et**

Ohio Appeals, 1st Dist, Hamilton Co

No 6000.   Decided June 30, 1941

Rosen & Rosen, Cincinnati, for appellee.

John D. Ellis, Cincinnati, and Nathan Solinger, Cincinnati, for appellants.

## 424

### OPINION

By MATTHEWS, PJ.

To decide this case it is unnecessary to start farther back than 1932, when the City of Cincinnati acquired the title to the real and personal property known as the Zoological Gardens. The power of the city to acquire, to own, and to operate it, is unchallenged—and, at this late date in the development of governmental functions, is unchallengeable. The purpose is public. The history of the Zoological Gardens prior to that date. while interesting, is immaterial. The reasons for the city's determination to assume this service are equally unimportant. The fact is that it did acquire this property for the public in the exercise of its lawful authority as a municipal corporation under the laws of Ohio.

It is equally clear and unchallenged that the city, having acquired this property, properly placed its control and operation under the jurisdiction of its board of park commissioners, as a governmental agency of the city. Indeed, one of the avowed purposes of this action is to strike down the present arrangement as an unconstitutional relinquishment by that board of its duty to control and operate it.

We, therefore, disregard the municipal legislation preceding the acquisition of the Zoological Gardens, and consider only the later municipal acts which this action challenge as an unconstitutional method of operating the property.

The City of Cincinnati entered into a contractual arrangement with the Zoological Society of Cincinnati, a nonprofit corporation, under the laws of Ohio, authorized generally to construct and maintain a museum for the preservation and exhibition of living and dead animals, and other works of nature, and a museum of natural history, and "of maintaining a park in which such animals may be housed, kept and cared for", where musical and other entertainments may be given, refreshments and recreation provided, and to promote interest in the preservation of the flora and fauna of the surrounding region. These general purposes are broad enough to include all the activities carried on under the name Zoological Gardens, but no doubt is left on that point because the articles of incorporation specifically provide that the corporation shall have the power to lease the Cincinnati Zoological Park upon such terms as may be agreed upon and to operate it for the use of the public "free from costs, charge, or expense" except such as should be necessary to operate, preserve and improve it. In clear and unmistakable language it was provided in the articles that no incorporator, subscriber, trustee, director, or member should receive any compensation, gain or profit from the corporation, nor any return of any part of any sum contributed in dues or otherwise, and that no division of the property or the income therefrom shall ever be made to the members of the corporation. As a matter of fact, the management of the Zoological Gardens has been its sole activity.

It would seem that a corporation organized and pursuing this one purpose is not only sanctioned by the general corporation laws, but that the purpose also brings it within the operation of §10193 GC, which authorizes municipalities and political subdivisions to deliver public land upon which to erect its buildings and carry out its purposes, without retention of any supervisory control by the municipality or political subdivision.

It is the arrangement between this corporation and the City of Cincinnati for the operation of the Zoological Gardens that is challenged in toto by this action, as beyond the power of the municipality and in violation of the constitution of Ohio.

As already stated, it is not disputed that Cincinnati as an Ohio municipality has the power to own and operate this park. It is equally clear that the Zoological Society of Cincinnati, a nonprofit corporation, is expressly authorized and has the power to own or lease, and operate such a park. But it is the contention that the constitution of

Ohio will not permit them to cooperate in the operation of this park, notwithstanding each has power to operate it separately. The constitutional barrier to such cooperation is said to be §6 of Art. VIII of the Constitution of Ohio.

Before considering this constitutional provision, let us consider briefly the terms of the agreement between the City and the Zoological Society for the operation of this park. There have been three agreements for stated intervals, but we shall consider the last only, as it is the current one.

The parties themselves called their arrangement a contract in the writing evidencing the terms. At no place is it referred to as a lease. There are provisions against waste and for quiet enjoyment which are customarily found in leases, but are equally appropriate in a contract authorizing the use of property without conveying any estate therein. However, the name and form of this arrangement are immaterial. The extent of the City's relinquishment of control is the substantial and controlling consideration.

The contract provided that it should cover a period of five years during which the Zoological Society agreed "to operate and maintain to the satisfaction" of the Board of Park Commissioners the property known as the Zoological Gardens, should suffer no waste, should keep the property in proper repair and maintain the Zoological collection "to the satisfaction of the Board", shall make no physical changes without the consent and approval of the Board, and then there was reserved to the Board of Park Commissioners representing the City the right to terminate the contract "at any time—if in its opinion this is necessary for the public health or safety, or if, in the opinion of the Board, the Society does not properly operate and maintain the property".

The Society was obliged to account for all of the property at the termination of the contract, and to render a complete audit of its financial operations each year and at the termination of the contract.

Taking the terms of this contract in conjunction with the limitations upon the power of the Zoological Society precluding it from operating for a profit, it is clear that all revenue received by it from whatever source must be expended in operating, preserving, and expanding the Zoological Gardens, and that the Zoological Gardens as thus operated, preserved, and expanded are, and will be at all times the property of the City of Cincinnati in which the Zoological Society has not now nor shall have at any time any title or control that is not immediately and at all times subject to the superior power of the City, which can oust the Society at will and place the management in other hands. There is no contrary claim made by either the City or the Society. The contracting parties are agreed on its meaning. The Society makes no claim of a vested or property right under this contract or of any control of the Zoological Gardens independent of the supervisory power of the City through the Park Board.

Reverting now to the asserted constitutional and other infirmities in this arrangement, we notice the claim that it violates §6 of Art. VIII of the Constitution, which provides:

"No laws shall be passed authorizing any county, city, town or township, by vote of its citizens, or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or to loan its credit to, or in aid of, any such company, corporation, or association; provided, that nothing in this section shall prevent the insuring of public buildings or property in mutual insurance associations or companies. * * *"

In applying this section the Supreme Court has held that it precluded a township from constructing a section of a continuous railroad line, the other parts to be constructed and owned by others, because the entire road was to be operated as a common enterprise. (Wyscaver v Atkinson, 37 Oh St 80), a city from expending money in enlarg-

ing a privately-owned waterworks system and then leasing it from the private owner at a rent payable out of the receipts (**Alter v Cincinnati, 56 Oh St 47**), and a city from repairing the road-bed of a private corporation having a franchise to operate street cars over roads in the public streets but charged with the duty of keeping in repair the streets between and immediately outside the tracks (**Cincinnati v Harth, 101 Oh St 344**). Courts of other states having similar constitutional provisions have made similar applications. But in each of these cases it will be observed that a private interest was being served in addition to the public interest. They are in contrast to this case in which the municipality owns all the property over which it has complete control at all times. In each of these cases the distinction is pointed out. The case at bar satisfies the condition stated at page 64 in Alter v Cincinnati, supara, that "The whole ownership and control must be in the public."

This case does not differ in principle from **Walker v Cincinnati, 21 Oh St 14,** which sustained the legislation authorizing the construction and operation of the Southern Railway under the management of a board of trustees. Speaking of §6 of Art. VIII, the court said:

"The mischief which this section interdicts, is a business partnership between a municipality or a subdivision of the state, and individuals or private corporations or associations. It forbids the union of public and private capital or credit in any enterprise whatever."

It is true that the Supreme Court at a later date held that legislation similar to that considered in Walker v Cincinnati violated the constitutional prohibition against special acts conferring corporate power but that does not weaken the case as an authority on the meaning of §6 of Art. VIII, and it has not been weakened by any other Supreme Court decision. **State ex rel v**

**Cincinnati Street Railway Co., 97 Oh St 283, at 300.**

In **State ex Leaverton v Kerns, 104 Oh St 550,** the court sustained an act (§9880-1 GC) authorizing counties to appropriate money for agricultural societies holding fairs. It was held to be an expenditure for a public purpose. We regard this case as sustaining a "grant-in-aid" of what in some aspects is a private enterprise on the ground that it is in the public interest. It was in substance a subsidy. The case at bar falls in a different category. All the expenditures, all the activities here relate to public property controlled by public authority and operated for a public purpose, through the agency selected and controlled by such public authority.

So we conclude that there is no inherent constitutional defect in the arrangement between the City and the Zoological Society.

And this conclusion disposes of the collateral issues, such as the appropriation of money to be expended on the Zoological Gardens and the furnishing of police services. There can be no legal objection to spending public money on public property and protecting it by police guards, and preserving the public peace at the same time.

The fact that private individuals have made gifts to the Zoological Society to be used in connection with the Gardens cannot affect the validity of the arrangement as such gifts when made are as much public funds as are the appropriations made from the public treasury for the maintenance of the Gardens.

The charging of an admission fee is also urged as illegal in itself, and because of the commingling of the fees with other funds. If the Zoological Society was engaged in other activities from which it derived revenues through admission fees, and had funds which it was free to use to promote those other purposes, this contention relating to the

commingling of public with private funds would require us to determine whether the City would be authorized under the law to grant a subsidy—but there is no other activity, and no free funds with which public funds could be commingled. As the funds all belong to the municipality, whether they shall be kept in separate funds or commingled is entirely a matter of policy and not of power. And, likewise, the matter of financing the enterprise falls within the field of policy and not of power. It is for the policy making department and not the courts to determine whether the activity shall be financed by funds raised by taxation on all, or whether those who are especially benefitted shall be required to pay all or a part. There is no exclusion from the Gardens by reason of the imposition of a non-discriminatory admission fee, and the cases in which courts have denounced discriminatory rules of exclusion are inapplicable.

For these reasons, we find in favor of the defendants and a decree may be prepared in conformity to this opinion.

HAMILTON, J., concurs.
ROSS, J., dissents.

ROSS, J., Dissenting:
There have been filed cross appeals on questions of law and fact from a judgment of the Court of Common Pleas of Hamilton County.

The action was instituted by a taxpayer and maintained on behalf of himself, the taxpayers of Cincinnati, and the City of Cincinnati.

It appears from the pleadings and evidence that sometime previous to July 6, 1932, a corporation, "The Cincinnati Zoological Park Association" owned and operated the Zoological Gardens, including a private park, buildings, and animals usually found in a zoo.

This organization became heavily financially involved, and it was apparent that it could not continue to operate even with gratuitous assistance from public spirited citizens of the city.

Whereupon, a movement was initiated resulting in the purchase by the city from the Association of its entire assets constituting the Zoological Gardens. This was accomplished pursuant to an ordinance of the City of Cincinnati, passed July 6, 1932, in part as follows:

"That it is hereby deemed necessary by the Council of the City of Cincinnati, State of Ohio, to issue and sell the bonds of the City in the sum of Three Hundred Twenty-Five Thousand Dollars ($325,000) for the purpose of acquiring the Zoological Gardens for park purposes, including all the lands, buildings, improvements, animals, and equipment therein, and also determining to proceed with the issue of said bonds in one lot without issuing notes in anticipation thereof." No. 343-1932.

Thereafter, on December 14, 1932, ordinance No. 525-1932, was enacted, which provided:

"Whereas, the City of Cincinnati has recently acquired from the Cincinnati Zoological Park Association all its real and personal property, known and operated as the Zoological Gardens; and

Whereas, As part of the consideration of said transaction, said Cincinnati Zoological Park Association agreed to maintain and operate said Zoological Gardens until January 1, 1933; and

Whereas, it is considered necessary and desirable to contract with another corporation organized not for profit for the operation and maintenance of the Zoological Gardens after January 1, 1933; now therefore,

Be It Ordained by the Council of the City of Cincinnati, State of Ohio (three-fourths of all members concurring thereto):

Section 1. That the control and supervision of all the real and personal property recently acquired from the Cincinnati Zoological Gardens, be, and the same. is hereby transferred to the Board of Park Commissioners.

Sec. 2. That the Board of Park Commissioners be, and it hereby is,

authorized and directed to execute an agreement with some corporation not for profit for the operation of Zoological Gardens in Cincinnati—providing for the operation and maintenance of all the real and personal property known as the Zoological Gardens, from and after January 1, 1933, on such terms and conditions as said Board may determine. Said agreement shall provide to save the City of Cincinnati harmless from any expense in connection with the maintenance and operation of said Zoological Gardens except that in the calendar year 1933, the City of Cincinnati shall pay to said corporation the sum of thirty thousand dollars ($30,000.00) less any amount of money that may be paid to said corporation by any other taxing body of the State of Ohio, to defray a portion of the cost of the maintenance during said year.

Said Board is herewith authorized to execute said agreement with such corporation organized not for profit without advertising for bids."

On March 15, 1932, there was filed with the Secretary of State of Ohio Article of Incorporation of the Zoological Society of Cincinnati, a non-profit organization. This organization had practically no assets of any description. Its purpose clause was as follows:

"Third. Said corporation is organized for the purpose of constructing and maintaining a museum for the preservation and exhibition of living and dead animals and other works of nature, and a museum of natural history, and of giving instruction in connection therewith; and of maintaining a park in which such animals may be housed, kept and cared for, and wherein musical concerts and other lawful entertainments may be given, refreshment and recreation provided, and sports had; and to encourage forestry; and to promote interest in, and the conservation and preservation of, the flora and fauna of the surrounding region."

It was further provided in said Articles of Incorporation:

"Sixth. Said corporation shall have power to lease the Cincinnati Zoological Park and other property from the City of Cincinnati, or any other taxing district, upon such terms and conditions as may be approved by its Board of Trustees. The buildings and grounds of said corporation, or leased by said corporation, shall be devoted to the use of the public, for all the purposes of said corporation, free from cost, charge or expense. except such as are necessary to provide the means to keep the buildings and grounds in proper condition and repair; to add to and improve the same for purposes aforementioned; to maintain and enlarge the stock of animals and of other works of nature exhibited therein; to provide entertainment and amusements; and to pay the cost of insurance, care, management and attendants; so that the public may have the benefit thereof for the uses aforesaid at as little expense as possible. No incorporator, subscriber, trustee, director or member shall receive any compensation, gain or profit from the corporation, nor any return of any part of any sum contributed, in dues or otherwise, and no division of said property, or the income therefrom, shall ever be made to the members of the corporation."

Pursuant to the ordinances of the City of Cincinnati and the Articles of Incorporation, the Board of Park Commissioners of the City of Cincinnati and the Directors of the Zoological Society of Cincinnati passed resolutions providing for a lease of the Zoological Gardens, buildings, and animals from the City of Cincinnati to the Society. This lease was executed December 30th, 1932, and covered a period beginning January 1, 1933 and terminated December 31st, 1933. The 14th paragraph of the lease provided:

"14. The Board agrees that the Society, observing and keeping the covenants and conditions of this contract on

its part to be kept, shall lawfully, peaceably and quietly hold, keep and enjoy the said property during the term hereof, without any let, hindrance, ejection or molestation by the Board."

This original lease provided also that the City of Cincinnati should during the calendar year 1933 pay to the Society the sum of $30,000.00. The clause providing for this payment was as follows:

"11. In the calendar year 1933, the City as provided in its ordinance referred to above shall pay to the Society the sum of $30,000.00, less any amount of money that may be paid to the Society by any other taxing body of the State of Ohio, to defray a portion of the cost of operation and maintenance during said year."

Only a part of this sum was paid to the Society.

This lease was renewed by the parties from time to time, the last lease being executed February 7, 1939, covering a period from January 1, 1939 to December 31, 1943.

In view of the issue raised in this action it is necessary to recite the provisions of this lease. They are as follows:

"1. The Society agrees to operate and maintain to the satisfaction of the Board all of the real and personal property of the City under the control of the Board and known as the Zoological Gardens, as more fully described in a deed recorded in Book 1626 page 601 of the records of the Recorder's Office of Hamilton County, Ohio, and as shown on the plat hereto attached and made part hereof, and a Bill of Sale recorded in Miscellaneous Book 6, page 359 of the records of the Recorder's Office of Hamilton County.

2. The Society shall save the City and the Board harmless from any and all damages, claims, or expense arising out of or in connection with the maintenance and operation of said Zoological Gardens, except as otherwise provided herein.

3. The Society shall suffer no waste to be committed on the premises and shall keep all real and personal property in proper repair and shall properly care for and maintain the Zoological collection to the satisfaction of the Board.

4. The Society shall have authority to rent or lease any part or parcel of the said real property not needed for Zoological purposes and shall collect and have the use of all rents arising therefrom, provided, however, that such action by the Society shall first have been approved by the Board.

5. The Society shall pay all taxes, assessments, license fees, utility service charges and any other expense incident to or connected with the ownership and/or operation of the said property.

6. The Society shall be privileged to call upon the City through the Board for any assistance in matters of purchasing, engineering, landscaping, et cetera, which the City may be able to furnish conveniently and on a reasonable basis to the mutual advantage of the parties thereto.

7. The Society shall not make any physical changes in the land or buildings without the consent and approval of the Board.

8. The Society shall carry for the benefit of the City such reasonable insurance as may be directed by the Board.

9. This contract shall cover the period of five years beginning January 1, 1939 and terminating December 31, 1943, but may be renewed by the Board for a like period with the same privilege of renewal.

10. This contract may be terminated at any time by the Board, if in its opinion this is necessary for the public health or safety, or if, in the opinion of the Board, the Society does not properly operate and maintain the property.

11. The inventory attached hereto shall be considered a part hereof and the Society agrees at the termination of this contract to account for all items

listed therein to the satisfaction of the Board; and the Society shall replace any lost, broken or damaged equipment or supplies, except that it shall not be held liable for ordinary wear and tear.

12. The Society shall furnish the Board each year and at the termination of this contract and each renewal thereof a complete, detailed audit of the financial operations of the property for the year.

13. The Board agrees that the Society, observing and keeping the covenants and conditions of this contract on its part to be kept, shall lawfully, peaceably and quietly hold, keep and enjoy the said property during the term hereof, without any let, hindrance, ejection or molestation by the Board."

The Society, since securing possession of the premises and assets, has operated the Gardens most satisfactorily to all concerned.

Its officers and members include many public spirited citizens who have without any compensation given of their time and energy in managing the Zoo and in the solicitation of funds.

The necessary funds to maintain and operate the gardens have been obtained from four sources—admission charges to the park, rent from concessions in the park, public gratuitous subscriptions, and money paid out of the city treasury to the Society. There is no question but that all of this revenue has been used in the maintenance and operation of the Gardens and Zoo.

By this action, the plaintiff seeks, first, to enjoin further payment of sums of money to the Society, second, to enjoin the Board of Park Commissioners from furnishing park policemen to the Society. Such policemen have, during the periods involved, been furnished at the costs of the city of Cincinnati. The plaintiff seeks to enjoin this practice. Third, the plaintiff seeks to cancel the lease contract now existing between the Board of Park Commissioners and the Society, and to enjoin the City or the Park Commissioners from further performance under such lease contract. Fourth, that

the premises involved be restored to the control and possession of the Board of Park Commissioners. Fifth, that the court render judgment in favor of the plaintiff, for use of the City, for the sums of money paid by the City of Cinnati to the Society. Sixth, that the Society be enjoined from charging admission fees to citizens and taxpayers of the City of Cincinnati, who desired to go upon the premises involved.

Now in the answer of the City, it is admitted that the Commissioners and the Society agreed "that the said Society was to operate and maintain to the satisfaction of the Board all of the real and personal property of the City under the control of the Board and known as the Zoological Garden".

It is denied that the agreement constituted a "lease". but it is stated that the agreement "was a contract for the operation and maintenance to the satisfaction of the Board of the Zoological Gardens by the Society.

It is claimed in the answer that the Board of Park Commissioners who are given complete jurisdiction over the property in question as a city park under the charter of the City still retain such jurisdiction and control and that the Society is a mere "agency through which the city operates the Zoological Gardens for its own sole benefit."

With the exception of the legal inferences to be drawn from the facts alleged, the answer substantially admits the facts set forth in the petition.

No reply was filed to the answer.

Now the situation presented is one which a court of equity should long hesitate to disturb. The arrangement undoubtedly has been to the general benefit of the city as a whole. On the other hand, if as claimed by the plaintiff, the arrangement, contract, agreement, or lease existing between the Board of Park Commissioners and the Society is in direct violation of the provisions of Art. VIII, §6 of the Constitution of Ohio, as is claimed by plaintiff, then the prayer of the petition that such contract should be annuled must be granted. In effect, the claim

of the plaintiff is that the Commissioners and the Society have entered into a joint enterprise for the operation of the Zoological Gardens. If this is the case, then the provisions of the Constitution of Ohio have been violated.

That such enterprises have been repeatedly held to be in violation of such provisions is shown in the following decisions of the Supreme Court of Ohio:

In **Wyscaver et v Atkinson, 37 Oh St 80,** the syllabus is:

"**Sec. 6 of Art. VIII** of the constitution inhibits the combination, in any form, of the public funds or credit of any county, city, town or township, with the capital of any other person or persons, corporated or unincorporated, for the purpose of promoting any private enterprise whatever. Hence, the act of April 6, 1880 (**77 Ohio L. 119**), 'To authorize certain townships to build railroads and to lease or operate the same,' is unconstitutional and void."

In **Alter v City of Cincinnati, 56 Oh St 47,** the second paragraph of the syllabus is:

"A city must be the sole proprietor of property in which it invests the public funds, and it cannot unite its property with the property of individuals or corporations, so that when united, both together form one property."

See also: **Markley v Village of Mineral City, 58 Oh St 430; City of Cincinnati v Harth, 101 Oh St 344; State ex Thomas v Semple, Dir. of Finance, etc., 112 Oh St 559; State ex Campbell v Cincinnati Street Ry. Co., 97 Oh St 283.**

The Commissioners rely first upon §10193 GC, which they claim specifically authorizes the arrangement involved. Even if this section can be harmonized with the requirements of **Art. II, §16 of the Ohio Constitution,** which is doubtful to say the least, it is extremely difficult to tell just what the legislature in this long garbled sentence constituting one section of the statute intended to authorize. If it attempted to authorize a joint enterprise, it is violative of **Art. VIII, §6 of the Constitution.** In any event, a careful reading of the statute does not reveal any situation exactly applying to that herein involved, although the articles of incorporation of the Society seem to have been drawn with direct relation to the provisions of the statute.

Some doubt, however, seems to exist in the minds of the Commissioners and City as they not only rely upon this section, but also upon decisions of the Supreme Court of Ohio, applying general provisions of the statute. Among these are the case of **Walker v City of Cincinnati, 21 Oh St 14,** the case which justified operation of the Southern Railway by Trustees for the City of Cincinnati. Now, although the defendants rely upon this case as being full justification for the procedure followed in the instant situation, the language of the opinion at page 54 does not seem to support this contention:

"The mischief which this section interdicts is a business partnership between a municipality or subdivision of the State, and individuals or private corporations or associations. It forbids the union of public and private capital or credit in any enterprise whatever, * * * "

The Supreme Court found that the City of Cincinnati had not entered into a business partnership with the railway or the trustees thereof. The Walker case, therefore, reaffirms the limitation upon municipalities and is no authority for an evasion of the inhibition of **Art. VIII, §6 of the Constitution.**

Counsel for defendants also rely upon the case of **State ex Leaverton et v Kerns, etc., 104 Oh St 550.** Again, the facts involved there are wholly different from the situation here presented. As is stated by the appellant defendants, there was no question of the use of public property, the only question being whether the county could subsidize a county fair which was primarily devoted to educational and agricultural purposes.

The second paragraph of the syllabus in the case of State ex Leaverton v Kerns, reads as follows:

"The aid provided by §9880-1 GC, is not for the purpose of furnishing financial assistance to a private enterprise, nor for lending the credit of the state thereto, but, on the contrary, is in aid of a public institution designed for public instruction, the advancement of learning and the cause of agriculture, and is not in violation of §§4 and 6, Art. VIII of the Ohio Constitution."

And, at page 554 of the opinion, the Court say:

"Sec. 9880-1, pertaining to independent societies, cannot be unconstitutional unless §9880, pertaining to county societies, is also invalid. The sections of the constitution above referred to forbidding financial aid, or the loan of the credit of the state, relate to private business enterprises, and, while they would forbid furnishing financial aid to any argricultural business, an agricultural fair is upon an entirely different basis, being a public institution designed for public instruction, the advancement of learning and the dissemination of useful knowledge. Such fairs are the same type of institution as the farmer's institute, aid for which is provided by §§9916 to 9921 GC."

Obviously, the situation cannot be defended upon the basis of a lease under general powers, since such act is only authorized when the property leased is not needed for public use. Sec. 3698 GC. Sec. 3699 GC, provides a procedure which was not followed in the instant case.

The defendants contend the Society is a mere agent or agency to do what the Park Commissioners themselves undoubtedly could do. If this were true, little difficulty would be presented in determining the perfect legality of the procedure adopted. It is because the facts presented show that the parties have gone far beyond such relationship of principal and agent, that the

provisions of Art. VIII, §6 of the Constitution collide with the arrangement maintained. As has been pointed out, the Gardens receive revenue from a number of sources, first, public gratuitous subscriptions by membership in the Society or outright gifts. These funds are collected by the Society, are its property. and are expended by it. Second, by charges made to all persons admitted to the grounds as patrons. These funds are collected by the Society, become its property, and are expended by it. Third, proceeds from concessions on the grounds, of which the same is true. Fourth, contributions of public funds from the Treasury of the City of Cincinnati to the Society, which money becomes the property of the Society, and is expended by it. In addition to these sources of revenue, the City furnishes park policemen and pays them out of public funds. The Commissioners retain a supervisory control over the operation of the gardens. The entire custody, possession, and control of the city property is given the Society, subject to objection by the Commissioners.

The Society is required by the lease contract to save the City harmless from damages, taxes, insurance, or other expenses. It has not done so.

While the Society may rent and sublease, the approval of the Commissioners is required. The Society can call upon the Commissioners for assistance in matters of purchasing, engineering, landscaping, et cetera.

It appears also that the Society has collected and spent large sums in improving the property and buildings in the gardens. The Society must furnish the Commissioners at the end of each year with a complete audit of its operations.

Just what is such an arrangement? Can it be successfully maintained that these facts do not show the existence of a joint enterprise between the City of Cincinnati and the Society, and a combination of financial and other assistance in maintaining a joint enterprise? Certainly, such is the situation and nothing else, and such be-

ing the case, the provisions of **Art. VIII, §6 of the Constitution** apply. This section provides:

"No law shall be passed authorizing any county, city, town or township, by vote of its citizens, or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or to loan its credit to, or in aid of, any such company, corporation, or association; provided, that nothing in this section shall prevent the insuring of public buildings or property in mutual insurance associations or companies. Laws may be passed providing for the regulation of all rates charged or to be charged by any insurance company, corporation or association organized under the laws of this state, or doing any insurance business in this state for profit."

In connection with this section of the Constitution, note the language in the case of **Wyscaver et v Atkinson et, 37 Oh St 80 at page 90** of the opinion, wherein it is said:

"Such being the scheme and operation of this statute, it is clearly in violation of **§6, Art. VIII, of the Constitution,** which provides: 'The general assembly shall never authorize any county, city, town or township, by vote of its citizens or otherwise, to become a stockholder in any joint-stock company, corporation or association whatever, or to raise money for, or loan its credit to, or in aid of any such company, corporation. or association.' In relation to this section, I cannot do better than adopt the language of C. J. Scott, in Walker v Cincinnati, **21 Oh St 14.** He said 'the mischief which this section interdicts is a business partnership between a municipality or subdivision of the state and individuals or private corporations or associations. It forbids the union of public and private capital or credit in any enterprise whatever. In no project originated by individuals, whether associated or otherwise, with a view to gain, are the municipal bodies

named permitted to participate in such manner as to incur pecuniary expense or liability. They may neither become stockholders, nor furnish money or credit for the benefit of parties interested therein. Though joint stock companies, corporations and associations only are named, we do not doubt that the reason of the prohibition would render it applicable to the case of a single individual. The evil would be the same, whether the public suffered from the cupidity of a single person or from several persons associated together.' And I will add, that it makes no difference whether the scheme for the union of public and private money or credit originates with the party or parties representing the public or the provate interests. In short, the thing prohibited is the combination in any form whatever of the public funds or credit of any county, city, town, or township with capital of any other person, whether incorporated or unincorporated, for the purpose of promoting any enterprise whatever."

Neither the charter of the City of Cincinnati nor the statutes of the State of Ohio may permit evasion of this interdiction of this section of the Constitution.

In the light of this statement of the law, note the first three sections of a stipulation just tendered by the Society:

"1. That all funds received by the Zoological Society of Cincinnati in connection with their operation of the Cincinnati Zoo, including admissions at the gate, membership dues, gifts, and funds appropriated by the City of Cincinnati are all co-mingled and kept in the general fund of the Zoological Society as one account.

2. In addition to the exhibition of animals at the Cincinnati Zoo, various contracts are let by the Zoological Society for the operation of such attractions as Kiddieland, pony track, refreshment and lunch stands, pure food show, opera, etc. Also the Zoo furnishes other accommodations such as picnic

434

grounds where individuals, families, and organizations have outings and picnics.

3. In the awarding of contracts and concessions, the Trustees of the Zoological Society, being a corporation not for profit is not bound by and does not comply with the specific statutory requirements relative to advertising, bids, and awarding of public contracts, applicable to cities, counties, etc.; but in all cases the Zoological Society does require and take 2 or more bids and in major operations advertises for bids before awarding contracts."

All the benefits now secured the City may be retained by a little change in procedure.

The Society may still exist, and, under the **direct** supervision of the Board of Park Commissioners, manage the Zoo. The gifts can be collected by the Society and paid to the Board. The collection of gate receipts and revenues from concessions can be collected by the Board. Park policemen may be furnished and paid by the City of Cincinnati. Certainly, the services of the Society in securing support for this asset of the City will be most welcome and valuable.

If the legal possession, control, and custody of the Board is secured and maintained, the advisory management by the Society cannot be criticized, and will be commended and appreciated.

This conclusion answers many of the contentions of the plaintiff.

There remains one further serious objection, in which the authorities give little assistance. This deals with a general admission charge to citizens and taxpayers and others, all alike. There seems to be no question that for special service, even to a citizen or taxpayer, a charge directly commensurate with the service may be made. A charge for toilet articles at a swimming pool, a charge for use of a golf course, or the use of bicycles, or other paraphernalia, all are proper. But if the citizen-taxpayer may be excluded from these Zoo Gardens, then he could be charged to enter any park or recreation filed, or other publicly owned property of the City, although these places are public property, belonging to him as a citizen and taxpayer.

It is stated, and the evidence justifies the conclusion that more than 65% of the revenue at the gate of the Zoo comes from non-residents of the City of Cincinnati. If such be the case, it should seem a simple matter to cause passes to be issued to such citizens and taxpayers and their families, and maintain the charge to non-residents. It seems a harsh situation when one citizen may take his family to the place of public recreation and educational environment, while another poorer citizen is excluded because he cannot pay for possibly a larger family. Certainly, this is an unreasonable operation of public property. The citizen's own government excludes him from that which is his property.

A charge to the non-resident is proper. The citizen and taxpayer should be permitted to enter his public park without charge, and such is the custom in most cities. There seems no reason why a different rule should prevail in any Ohio city.

As to the claim of the plaintiff to recover for moneys given the Society, the evidence clearly shows that these funds have been spent indirectly for the benefit of the public, or, at least, a large portion of the public. Equity cannot decree their return to the City which has so used them.

The prayer of the plaintiff for cancellation of the contract, the return of the property to the Board of Park Commissioners and injunction against charge to residents of the City and City taxpayers for admission to this public park should be granted; otherwise, the prayer of the petition is denied.