[This opinion has been published in *Ohio Official Reports* at 88 Ohio St.3d 37.]

C.I.V.I.C. GROUP ET AL., APPELLANTS, *v.* CITY OF WARREN ET AL., APPELLEES.

[Cite as *C.I.V.I.C. Group v. Warren*, 2000-Ohio-265.]

*Municipal corporations—Public debt—Section 13, Article VIII, Ohio Constitution—When city contributes to payment for and financing of residential subdivision development project, it violates Section 6, Article VIII, Ohio Constitution.*

Where a city contributes to the payment for and financing of a residential subdivision development project, the city is taking action "to raise money for," and "loan its credit to, or in aid of," private corporations in violation of Section 6, Article VIII of the Ohio Constitution.  The city's actions do not fall within the exception contained in Section 13, Article VIII of the Ohio Constitution.

(No. 98-2521–Submitted November 2, 1999–Decided February 16, 2000.)

APPEAL from the Court of Appeals for Trumbull County, No. 98-T-0001.

_____

{¶ 1} Silverlands North, Inc. ("Silverlands") and Crossbar Realty Company ("Crossbar") own a one-hundred-acre tract of land in Warren, Ohio.  The land is being developed as a subdivision of upscale single-family residences.  Warren has been economically depressed for some time, and the city government welcomed the project.

{¶ 2} Silverlands and Crossbar approached Warren city officials.  The developers sought the city's assistance in the construction of a new street, sewers, water lines, and other improvements to the property.  In response, the city passed several ordinances.  The first ordinance, Ordinance 10937/96, authorized the city to advertise for bids and to contract for the construction of the street and other

improvements. The ordinance provided that the private developers would be responsible for eighty percent of the construction costs. Another ordinance, Ordinance 11035/97, provided for the issuance of certain bonds and promissory notes for the purpose of raising $300,000, to be used to pay for the construction. Tax revenue was pledged to pay the notes and bonds.

{¶ 3} In conjunction with the passage of Ordinance 10937/96, the city entered into a reimbursement agreement with Silverlands and Crossbar. Under the terms of this agreement, the city promised to construct a public street off East Market Street in order to provide access to the subdivision, to construct sewers, water lines, and related improvements to serve the subdivision, and to pay a portion of the associated engineering costs. The developers dedicated the street and improvements for public use. In return, the two companies agreed to reimburse the city for eighty percent of the costs, as previously stated in Ordinance 10937/96. This reimbursement would not include costs for the preparation and advertisement for bids, costs associated with the preparation and awarding of contracts, costs associated with obtaining the necessary permits, and related legal expenses. Additionally, the agreement provided that the two companies were obligated to pay a portion of this debt each time one of the single-family residences along the street to be built by the city was sold, but the entire debt was due in fifteen years regardless of how many residences were sold.

{¶ 4} Plaintiffs-appellants are the C.I.V.I.C. Group ("Citizens Involved in the Community"), a private association, and its members, over three hundred residents, taxpayers, and property owners in the city. They filed a complaint seeking injunctive and declaratory relief, alleging that the ordinances and reimbursement agreement were unconstitutional because they constituted a loan and gift of public funds to private corporations in violation of Section 6, Article VIII of the Ohio Constitution. Appellants named the city of Warren and several

city agencies and officials as defendants, collectively referred to as the "city," defendants-appellees. Silverlands and Crossbar became intervening defendants.

{¶ 5} After the complaint was filed, the city finalized a contract with J.S. Northeast, Inc. for the work at a price of $568,896.58.

{¶ 6} The trial court found that the construction at issue constituted an improvement of property. The court then concluded that the improvement of property was for commerce and industry, and met the exception of Section 13, Article VIII, Ohio Constitution. The court relied on our decision in *State ex rel. Lake Cty. Bd. of Commrs. v. Zupancic* (1991), 62 Ohio St.3d 297, 581 N.E.2d 1086, to reach this conclusion. However, the court did find that Ordinance 11035/97 was unconstitutional to the extent that it pledged tax revenue to pay the notes and bonds provided for in the ordinance.[1] The trial court believed that if the ordinance was made to comply with Sections 6 and 13 of Article VIII, it would be constitutional. The trial court found no other constitutional infirmities.

{¶ 7} The court of appeals affirmed. Finding *Zupancic* controlling and the exception contained in Section 13, Article VIII applicable, the appellate court held that a political subdivision can loan public funds to for-profit corporations when the funds will be used for the construction of property improvements that will benefit the industry and commerce of the state. The court found that it was the activities spawned by the construction that would be beneficial to industry and commerce. The appellate court also found that the twenty-percent project cost incurred by the city was not a gift but rather "the purchase price paid by the city for the dedicated improvements which it will acquire from the developers."

{¶ 8} This cause is now before the court upon the allowance of a discretionary appeal.

_____

1. This ruling is not at issue in this appeal.

*Frank R. Bodor,* for appellants.

*David D. Daugherty,* for appellee city of Warren.

*Barry M. Byron, Stephen L. Byron* and *John Gotherman,* urging affirmance for *amicus curiae*, the Ohio Municipal League.

_____

**FRANCIS E. SWEENEY, SR., J.**

{¶ 9} In this case, we are asked to construe Sections 6 and 13, Article VIII of the Ohio Constitution to determine whether the city ordinances and reimbursement agreement are constitutional. Because we find that the ordinances and the reimbursement agreement violate Section 6, Article VIII, Ohio Constitution, and do not fit the exception of Section 13, Article VIII, Ohio Constitution, we reverse the judgment of the court of appeals.

{¶ 10} Section 6, Article VIII of the Ohio Constitution provides:

"No laws shall be passed authorizing any * * * city * * *, by vote of its citizens, or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or to loan its credit to, or in aid of, any such company, corporation, or association * * *."

{¶ 11} The history behind the adoption of this section is relevant to our determination today. In the early days of statehood, Ohio's fertile soil and abundance of water provided many opportunities, yet Ohioans lacked the efficient means to get their products to market. Thus, Ohio's prosperity depended on the construction of a transportation network. David M. Gold, Public Aid to Private Enterprise under the Ohio Constitution: Sections 4, 6, and 13 of Article VIII in Historical Perspective (1985), 16 U.Tol.L.Rev. 405, 407-408. As explained in the editorial comment to Section 4, Article VIII (the provision prohibiting state activities):

"Since the state's own resources were limited (at least at first), the legislature relied heavily on private enterprise to build and operate roads, bridges,

ferries, canals and railroads. Most of the canal system was financed directly by the state, resulting in debts of $16 million. In the 1830's the state and local governments shifted to a policy of financing turnpike, canal and railroad companies by lending credit or purchasing stock. Insofar as an effective transportation network sprang into being in a remarkably short time, these practices had the desired result. But, they also had undesirable results: they put the state's money and credit at risk in business schemes that often were risky at best, and the demonstrated willingness of the legislature and local bodies to use them was an open invitation for private interests to dip into the public till. Many of these companies failed, the public debt burgeoned as a consequence, and by 1850 the burden was more than the taxpayers could tolerate. This section was adopted to put a halt to these practices." 2 Baldwin's Ohio Revised Code Annotated (1993) 202.

{¶ 12} The climate of the times was agitation and anger over the imposition of tax burdens on the citizens for the benefit of private corporations and for the public losses incurred when subsidized corporations failed. Gold, 16 Toledo Law Review, at 411. Although times may have changed, the reason for the existence of Section 6, Article VIII is as valid today as it was in 1851. Its purpose is to prohibit private interests from tapping into public funds at the taxpayers' expense.

{¶ 13} Cases construing Section 6 of Article VIII have found that it forbids the union of public and private capital or credit in any enterprise whatsoever. *Alter v. Cincinnati* (1897), 56 Ohio St. 47, 63, 46 N.E. 69, 70; *McGuire v. Cincinnati* (App.1941), 35 Ohio Law Abs. 423, 22 O.O. 334, 40 N.E.2d 435. It does not matter that the public may, directly or indirectly, benefit from the enterprise. In *Taylor v. Ross Cty. Commrs.* (1872), 23 Ohio St. 22, this court was asked to pass judgment on a legislative Act that authorized the building of portions of railroads by local governments and the sale or lease of those portions to private railroad companies. In finding the Act unconstitutional, this court stated: "It may be that, without the aid of this law, projects may fail, which could, under it, have been prosecuted to

successful and useful results. But this consideration can have no influence in a judicial tribunal invested with the high trust of seeing, in the administration of justice, that the constitution suffers no detriment, from whatever quarter or in whatever shape the threatened invasion comes." *Id.* at 84-85.

{¶ 14} The ordinances and agreement in question clearly violate Section 6, Article VIII. The usual course of business, when developing a residential subdivision, requires the private developer to put in the streets and utilities, and recover the cost in the price of each lot in the development. The property owners are in effect assessed when the property is sold. Here, however, there is no assessment, and the developers still plan to realize the profits on the lots. Moreover, the city is paying twenty percent of the construction bill and financing the remainder of the private developers' costs. The city is also paying advertising costs, permit fee costs, and legal expenses, as well as a portion of the engineering costs. These actions by the city "raise money for" and "loan its credit to or in aid of" private corporations.

{¶ 15} The city, however, does not believe that a violation of Section 6, Article VIII occurred. The city argues that Section 6 is not implicated because the street and other improvements have been dedicated for public use and thus are city property. Moreover, the city contends that the construction of streets and utilities are traditional governmental functions and are valid pursuant to *Heffner v. Toledo* (1907), 75 Ohio St. 413, 80 N.E. 8, and R.C. Title 7.

{¶ 16} Although a municipality has the power to construct streets and improvements, see R.C. 715.19 and 717.01, R.C. Chapter 727 provides for assessing costs to abutting property owners. A special assessment levied pursuant to R.C. Chapter 727 is a lien against the land being assessed, which runs with the property. R.C. 727.27. Thus, when a new property owner purchases the property that has benefited from construction financed by a special assessment, the new owner is responsible for the remaining payments. This method ensures that in case

6

of a nonpayment, the municipality has a method to recover its costs. R.C. 727.31. Here, this procedure was not followed. The reimbursement agreement and enabling ordinances provide that the developers will reimburse eighty percent to the city in thirty-two installments, on a per-lot basis, with each installment based on the amount of frontage of the lot. An installment is due upon the sale of each lot, with any remainder of the loan due in fifteen years. No liens will run with the land when title transfers from the developers to the purchasers. If the corporations become insolvent, bankrupt, or otherwise unable to repay, the city is left without a remedy to collect on the outstanding debt. This type of repayment scheme is not authorized by R.C. Chapter 727 and places taxpayers' funds at risk. If the project fails, the taxpayers are saddled with the debt. This is what Section 6, Article VIII was intended to prevent.

{¶ 17} Although the court of appeals agreed that this was a loan, it found that the exception in Section 13, Article VIII applied. However, even the city believes that this was a stretch. In fact, at oral argument, the city's attorney admitted that the courts went too far in finding that Section 13 applied. We agree.

{¶ 18} Section 13, Article VIII of the Ohio Constitution provides: "To create or preserve jobs and employment opportunities [and] to improve the economic welfare of the people of the state, * * * it is hereby determined to be in the public interest and a proper public purpose for the state or its political subdivisions * * * to * * * construct * * * [and] improve * * * property, structures, equipment, and facilities within the State of Ohio for industry, commerce, distribution, and research, to make or guarantee loans and to borrow money and issue bonds or other obligations to provide moneys for the * * * construction * * * [and] improvement * * * of such property * * *."

{¶ 19} In *Zupancic*, we found that this exception enabled the construction of for-profit, multiunit, low- and moderate-income rental housing where a profitable exchange of rent money for services takes place. In finding that rental

housing fit the definitions of industry and commerce, we focused on the activities that would occur once construction was complete rather than those occurring during the construction itself. 62 Ohio St.3d at 301, 581 N.E.2d at 1089, fn. 8. The construction of this street containing two cul-de-sacs and related improvements does not meet the definitions of industry and commerce. Once construction is complete, no one is benefited except the residential property owners. We will not stretch the narrow exception found in Section 13, Article VIII to justify this private enterprise.

{¶ 20} Accordingly, we hold that where a city contributes to the payment for and financing of a residential subdivision development project, the city is taking action "to raise money for" and "loan its credit to, or in aid of" private corporations in violation of Section 6, Article VIII of the Ohio Constitution. The city's actions do not fall within the exception contained in Section 13, Article VIII of the Ohio Constitution. Thus, we find that the city's financing of the construction of the street and reimbursement agreement and its enabling ordinances are unconstitutional. We reverse the court of appeals' judgment.

*Judgment reversed.*

MOYER, C.J., DOUGLAS and RESNICK, JJ., concur.

PFEIFER, COOK and LUNDBERG STRATTON, JJ., dissent.

————————————

**Cook, J., dissenting.**

{¶ 21} I respectfully dissent. I believe that this case is, for purposes of constitutional analysis, indistinguishable from *State ex rel. Lake Cty. Bd. of Commrs. v. Zupancic* (1991), 62 Ohio St.3d 297, 581 N.E.2d 1086. I would hold, therefore, that the city may constitutionally enter into the financing plan at issue. The street and other improvements that the city wishes to finance would be owned by the city—not by the private developers. Furthermore, the improvements would

be beneficial to commerce and industry by facilitating the construction of the planned housing development and, ultimately, the sale of residential properties.

{¶ 22} First, I am not convinced that the city's actions even implicate Section 13, Article VIII, Ohio Constitution. The court of appeals stated that the city's undertaking to finance the improvements to the development and to assume twenty percent of the cost of construction of those improvements is, "[i]n effect, * * * the purchase price paid by the city for the dedicated improvements which it will acquire from the developers." But assuming Section 13, Article VIII is implicated, as the court of appeals held, the city's "loan" of the funds necessary to build a street and related improvements comes within the Section 13, Article VIII exception for commerce and industry. This court held, in *Zupancic*, that "commerce" is " '[t]he exchange of goods, productions, or property of any kind' " and "industry" is " 'the commercial production and sale of goods and services.' " *Id.* at 301, 581 N.E.2d at 1089, quoting Black's Law Dictionary (6 Ed.1990) 269 and American Heritage Dictionary (1981) 672. I agree with the court of appeals' view that the construction and sale of residences constitutes "commerce" and "industry." As that court explained:

"Although the streets and appurtenances themselves will not be a source of industry and commerce, the residential development and sale of the residential homes * * * certainly will. These sales clearly satisfy the *Zupancic* definitions of industry and commerce. Thus, Section 13 of Article VIII of the Ohio Constitution is consistent with the construction ordinance in the instant case."

{¶ 23} For these reasons, I would affirm the court of appeals.

PFEIFER and LUNDBERG STRATTON, JJ., concur in the foregoing dissenting opinion.

————————————