OPINION
Robert L. Burton, Jr. and Claire Vaughn Perks (hereinafter collectively referred to as "the taxpayers"), acting on behalf of the taxpayers of the city of Springfield, appeal from a judgment of the Clark County Court of Common Pleas, which dismissed their complaint pursuant to Civ.R. 12(B)(6).
The facts giving rise to this appeal are as follows.
On August 24, 1999, the City Commission of the city of Springfield authorized the city manager to enter into pre-annexation agreements with the Windy Knoll Investors and with John Howell and Dan Rueger (hereinafter collectively referred to as "the developers"). The city manager did enter into such agreements, which will be referred to individually as the Windy Knoll Agreement and the Howell Agreement or collectively as the agreements. The land at issue in these agreements, which was owned by the developers, was adjacent to the city of Springfield but was not part of the city at the time of the agreements.
The agreements were very similar. Generally, each provided that the parties would seek the annexation of the properties to the city and that, upon the approval of such annexation, the city would construct a roadway known as the Bechtle Avenue Extension, along with two connectors, upon a one hundred foot wide right-of-way conveyed to the city by the developers. The Bechtle Avenue Extension would connect State Route 41 with Eagle City Road.
The Windy Knoll Agreement contained a provision whereby the developers were to reimburse the city, as lots were sold, for ninety percent of the cost of the road in non-residential areas and one hundred percent of the cost in residential areas, calculated per foot of frontage on the road. Similarly, the Howell Agreement provided that the developers would repay to the city ninety percent of the cost of the road per foot of frontage as lots were sold, leased, or otherwise conveyed, regardless of their intended use. To secure such payment, the developers agreed to provide the city with an easement along each side of the road such that the city could restrict access to the road until the allotted cost for each lot had been paid or secured by a lien.
The City Commission also authorized the city manager to enter into Side Letter Agreement #2 with respect to the Howell Agreement. This agreement stated, in pertinent part:
 The City Staff and the Owners have had numerous discussions in March, April and May of 1999 regarding the potential zoning for the land which is the subject matter of the * * * Pre-Annexation Agreement (the "Property") * * *. There was a consistent opinion expressed by both City Staff and the Owners['] representative that the Property should probably be zoned commercial (B-1 or B-1A) at the south end, transitioning into offices (CO-1), at the north end where it reached St. Paris Pike. It is possible that a portion of the Property could be zoned residential, if the Owners wish to do so, near the existing residential neighbors.
 The Property is shown on the City/County Comprehensive Plan as being best suited for the uses listed in the above paragraph.
 The property is currently zoned R-1 * * * and A-1 * * *. The parties agree that if the Owners submit an application to zone the Property consistent with the above paragraphs and the request is turned down by the City Commission and the Property remains as it is currently zoned that, notwithstanding the provisions of the Pre-Annexation Agreement, that the Owners shall not be responsible for payment of any portion of the cost of the installation of the Bechtle Avenue [E]xtension across the Property.
The taxpayers lived in a residential neighborhood near the proposed construction. Pursuant to R.C. 733.56, they requested that the city law director seek an injunction to restrain the performance of the agreements on the basis that they were contrary to law. When the law director refused to take such action, the taxpayers filed suit in their own names on behalf of the city pursuant to R.C. 733.59. They alleged that the Howell Agreement constituted unlawful contract zoning and that it bargained away the city's legislative discretion in zoning decisions. They also alleged that the Windy Knoll and Howell Agreements were contrary to Ohio law insofar as they restricted access to public streets. The city filed a motion to dismiss pursuant to Civ.R. 12(B)(6) for failure to state a claim upon which relief can be granted.
The trial court concluded that the language of the Howell Agreement and Side Letter Agreement #2 did not support the taxpayers' theory that the agreements bargained away the legal discretion of the city because there was "nothing in the contract or pre-annexation agreement that a rezoning application, if submitted, would be approved or denied. * * * This is not an agreement that requires the City to rezone real estate in exchange for payment of the cost of road construction." The trial court also concluded that the agreements, as they provided easements to secure payment, were not unlawful, and further that these taxpayers lacked standing to complain that the agreements unlawfully restricted access to public streets. Accordingly, the trial court granted the city's motion to dismiss.
The taxpayers raise four assignments of error on appeal. We will consider these assignments in the order that facilitates our discussion, beginning with the second and fourth assignments.
 II. THE TRIAL COURT ERRED IN HOLDING THAT THE CITY'S CONTRACT WITH PRIVATE DEVELOPERS DID NOT CREATE AN IMPERMISSIBLE CONFLICT OF INTEREST AND DID NOT CONSTITUTE AN UNLAWFUL BARGAINING AWAY OF THE CITY'S LEGISLATIVE DISCRETION.
 IV. THE TRIAL COURT ERRED IN HOLDING THAT THE CITY'S CONTRACT WITH PRIVATE DEVELOPERS WAS NOT CONTRARY TO OHIO LAW.
These assignments contend that the city's agreements with the developers were unlawful. Under the second assignment of error, the taxpayers contend that the Howell Agreement, as supplemented by Side Letter Agreement #2, constituted an impermissible contract controlling the exercise of municipal legislative power and prevented the city from being impartial in the enactment of zoning regulations because the city had a financial interest in the future zoning classification of the property. The taxpayers claim that, because the city would "be contractually obligated to pay the entire cost of the Bechtle Avenue Extension * * * in the event that they [sic] deny the [zoning] applications," it could not be unbiased in reviewing the applications. In their fourth assignment, the taxpayers assert that the supreme court's decision in C.I.V.I.C. Group v. Warren (2000), 88 Ohio St.3d 37, which was rendered after the trial court's decision in this case and "is directly on point with the circumstances" herein, compels the conclusion that "the reimbursement scheme [in both agreements] is not authorized by R.C. Chapter 727 and is contrary to the Ohio Constitution."
The taxpayers claim that "the [Howell] transaction clearly contains a transfer of a substantial, material benefit in return for the approval of zoning applications not yet filed with the [city]." We disagree with this interpretation of the agreement. The agreement provided the city with a right-of-way on which to build a thoroughfare. The city agreed to bear the cost of construction with the understanding that, if the zoning was changed to allow for residential or commercial development of the abutting property, the developer would contribute to the cost of the road in proportion to the manner and extent to which the property was developed. Neither the Howell Agreement nor Side Agreement #2, which supplemented it, required the city to zone the property in any particular way. As the trial court pointed out, the fact that a city stands to benefit from a zoning decision does not disqualify the city from enacting zoning regulations and "cannot be considered as illegally controlling the course of legislative decision making." We share the trial court's view that the taxpayers could not sustain a cause of action pursuant to R.C. 733.56 based on unlawful contractual zoning because the Howell Agreement and Side Letter Agreement #2 did not obligate the city to zone the property in any particular way.
The taxpayers also claim that C.I.V.I.C. Group, 88 Ohio St.3d 37, supports their assertion that the agreements at issue here are unlawful. In C.I.V.I.C. Group, the supreme court examined an arrangement between a municipality and developers for the construction of roads and improvements. The developers sought to build an upscale, single-family subdivision on two cul-de-sacs. The city, eager for economic growth, passed ordinances in which it agreed to pay all of the costs for advertising for bids and awarding contracts, the costs of necessary permits, and the legal and engineering costs of installing the roads and improvements.Id. at 40. The city issued bonds to pay for the construction which were backed by taxpayers dollars. Id. at 37. The developers were responsible to pay eighty percent of the cost of the roads as lots were sold, payable over fifteen years, but this obligation was not backed by liens on the lots. Id. at 41. The developer dedicated the streets and the improvements for public use. Id. at 38.
A citizens' group challenged this arrangement on the ground that it was an unlawful gift and loan to a private corporation. The supreme court agreed, noting that, in the usual course of residential development, a city recoups one hundred percent of the cost of roads, sewers, and other improvements. Id. at 40. The supreme court concluded that the arrangement the city had offered to the developers amounted to raising or loaning money for the benefit of a private corporation and that the repayment scheme placed taxpayer dollars at risk for the corporation's benefit.Id. at 40. The court was careful to distinguish a municipality's construction and improvement of property and structures for residential development, which benefits no one other than the property owners once the construction is completed, from construction and improvement for industry or commerce, which is "in the public interest and [for] a proper public purpose." Id. at 41-42. The court recognized that Section 13, Article VIII of the Ohio Constitution permits such expenditures to benefit industry or commerce, but noted that Section 6, Article VIII "forbids the union of public and private capital or credit in any enterprise whatsoever" and that R.C. Chapter 727 provides for assessing costs to abutting property owners. Id. at 40-41. Under these circumstances, the court found that the city's financing of construction of the street and its reimbursement agreement with the developers did not fall within the narrow exception to the assessment of costs set forth in Section 13, Article VIII of the Ohio Constitution. Id. at 42.
As a preliminary matter, we note that it has not yet been determined for what purposes the property at issue in these agreements will be used. Insofar as the holding in C.I.V.I.C.Group was closely tied to the use of the property for residential development, and because it is not clear whether any residential development will be sought in this instance, it would be premature for us to consider whether C.I.V.I.C. Group, or Section 6 or Section 13 of Article VIII, applies.
Moreover, even if we were to assume, for the sake of argument, that some residential development will occur, the facts in C.I.V.I.C. Group would not be analogous to the facts of this case. Here, the obligations at issue were to be secured by liens that ran with the land. This was not the situation in C.I.V.I.C.Group. Furthermore, the Windy Knoll Agreement provided for the developers to compensate the city for one hundred percent of the improvements in any residential areas, and the Howell Agreement provided for ninety percent reimbursement, as opposed to eighty percent in C.I.V.I.C. Group. Because of these distinctions, we question whether C.I.V.I.C. Group would support the taxpayers' claim that the city's agreements with the Windy Knoll and Howell developers were unlawful.
The second and fourth assignments of error are overruled.
 I. THE TRIAL COURT ERRED IN HOLDING THAT A TAXPAYER MUST ALLEGE WRONGDOING ON THE PART OF MUNICIPAL OFFICIALS IN ORDER TO SUSTAIN A TAXPAYER ACTION PURSUANT TO R.C. 733.59.
Burton contends that the trial court erred in concluding that a taxpayer must allege fraud or other wrongdoing on the part of city officials in order to succeed in an action brought pursuant to R.C. 733.59. The trial court relied on Allright Parking ofCleveland, Inc. v. Cleveland (July 25, 1991), Cuyahoga App. No. 58944, unreported, in reaching this conclusion.
R.C. 733.56 provides that:
 The village solicitor or city director of law shall apply, in the name of the municipal corporation, to a court of competent jurisdiction for an order of injunction to restrain the misapplication of funds of the municipal corporation, the abuse of its corporate powers, or the execution or performance of any contract made in behalf of the municipal corporation in contravention of the laws or ordinance[s] governing it, or which was procured by fraud or corruption.
Where a village solicitor or city director of law refuses to take such action, R.C. 733.59 permits an individual taxpayer to pursue such an action on behalf of the city, as happened in this case.
In its judgment entry, the trial court stated that "[a] taxpayer's lawsuit is intended to protect against dishonest public officials. The taxpayer must allege wrongdoing on the part of those officials," citing Alright Parking, supra. This statement reflects the holding in Allright Parking, in which fraud was the only basis set forth in R.C. 733.56 upon which the taxpayers had based their claim. A reading of the statute clearly shows, however, that there are other independent bases upon which a taxpayer could maintain an action pursuant to R.C. 733.56 without showing fraud on the part of the public officials. Thus, the trial court's judgment was in error insofar as it suggested that a taxpayer must show fraud in every case.
Nonetheless, the trial court proceeded to address whether the performance of the agreements entered by the city violated the laws or ordinances governing it, which was the portion of the statute on which the taxpayers had focused their argument. Insofar as the trial court thoroughly addressed the specific argument raised by the taxpayers in this case and found it to be without merit, its misstatement of the law regarding the need for an allegation of fraud was harmless error.
The first assignment of error is overruled.
 III. THE TRIAL COURT ERRED IN HOLDING THAT THE CITY'S CONTRACT WITH PRIVATE DEVELOPERS WAS NOT CONTRARY TO OHIO LAW IN THAT IT WITHHELD A PUBLIC RIGHT OF ACCESS TO PUBLIC STREETS IN ORDER TO COERCE PAYMENT OF A PRIVATE OBLIGATION.
The taxpayers argue that the agreements are contrary to Ohio law because they deprive the property owners abutting the Bechtle Avenue Extension of their right to use the road in common with other members of the public, without compensation, by conditioning their access to the Bechtle Avenue Extension on their payment of a portion of the cost of the road.
The property owners, who were the developers, agreed with the city to condition access to the Bechtle Avenue Extension upon payment of their share of the cost of constructing the road. The developers were free to enter into such an agreement with the city in exchange for the desired improvements and, in light of the comprehensive nature of the parties' agreements, we cannot hold that these owners agreed to this condition without compensation or, more apropos of this situation, consideration. Moreover, only these property owners' rights were affected by the provision in question, and therefore only these owners could challenge it. The trial court correctly found that the taxpayers had no standing to raise this issue.
The third assignment of error is overruled.
The judgment of the trial court will be affirmed.
FAIN, J. and YOUNG, J., concur.