**KITTEL, Appellee, v. CITY OF CINCINNATI, et, Appellants.**

Ohio Appeals, First District, Hamilton County.

No. 6645—Decided May 20, 1946.

Sol Goodman, Cincinnati, for Appellee.

Hyman B. Rosen, Cincinnati, for Appellee.

John D. Ellis, Cincinnati, and Ed. F. Alexander, Cincinnati, for Appellants.

Loyal S. Martin, Cincinnati, Amicus Curiae.

## OPINION

By MATTHEWS, J.

This is an action to enjoin the City of Cincinnati and its officers from proceeding under two ordinances to purchase the Price Hill Inclined Plane and from issuing bonds therefor, and, after acquiring it, from entering into the contract authorized by the ordinance for its operation by The Cincinnati Street Railway Company.

The appeal to this Court is on both law and fact. It is submitted to this Court upon the pleadings, the two ordinances relating to the purchase and operation of The Price Hill Inclined Plane, and the ordinance of 1940 of the City of Cincinnati, granting a franchise for twenty-five years to The Cincinnati Street Railway Company to operate a system of street railways on and over certain of its streets.

The Price Hill Inclined Plane was built more than sixty years ago. It extended from a point in West Eighth Street to a point at the brow of Price Hill, the difference in the level of the two termini being in excess of three hundred feet. It was built and is owned now by the Price Hill Inclined Plane Railroad Company, a corporation that operated it continuously as a common carrier from the time of its construction until the year 1943. At that time, it was declared unsafe for use without extensive repairs and replacements. The Price Hill Inclined Plane Railroad Company, faced with the alternative of expending the money necessary for the making of the repairs and replacements or discontinuing its operation, chose the latter, and since that date the property has been out of use.

The reason for the failure of The Price Hill Inclined Plane Railroad Company to make the additional investment does not expressly appear, but, of course, it is inferable that it regarded the enterprise as not attractive from the viewpoint of profit. It could not have been because it could not be operated as an independent undertaking. It had been so conducted for many years when the same circumstances existed as prevailed at the time the service was discontinued.

In response to demand for service by those who had been accustomed to avail themselves of this utility, the City pro-

ceeded to study the problem.

In the franchise of The Cincinnati Street Railway Company, the City of Cincinnati is given continuing power to require extensions of existing routes and to create new and additional routes and require the operation thereof by The Cincinnati Street Railway Company, but this power is not unlimited and any order made by the City in that regard probably would be subject to appeal to arbitrators, as provided in the franchise ordinance.

If The Cincinnati Street Railway Company should be required to furnish this service under its franchise, the utility would become its property and not that of the City of Cincinnati, and it would operate it under the terms of its franchise and as an integral part of its system. Whatever the reason, the City chose another method of providing this public service. It determined to buy and reconstruct the Price Hill Inclined Plane. Apparently, it negotiated with the owners and reached an agreement on the purchase price.

On May 31st, 1945, the Council of the City of Cincinnati passed an ordinance authorizing the issuance and sale of bonds in the sum of $75,000.00 "for the purpose of providing a fund to acquire and reconstruct the Price Hill Inclined Plane for the transportation of passengers."

While the relief prayed for in the petition includes an injunction against anything being done under this ordinance this position seems to have been abandoned by the plaintiff. In any event, it is clear that the purposes for which these bonds are to be used are clearly within the municipal power. as conferred by Sec. 4 of Article XVIII of the Ohio Constitution, which provides that: "Any municipality may acquire, construct, own, lease and operate, within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service." Of course, this power must be exercised within the limitations imposed by other constitutional provisions.

By the express terms of the ordinance, the purpose of acquiring and reconstructing the Price Hill Inclined Plane was to utilize it as a means of transporting passengers. Standing alone, it would seem to be unassailable as the exercise of power conferred by the Constitution.

But the municipal council passed another ordinance on the same day providing for the operation of this inclined plane by The Cincinnati Street Railway Company, and it is contended that this shows that while the bond ordinance ostensibly provides for the expending of the money to acquire a

public utility, the actual purpose is to extend credit, raise money, or enter into a virtual partnership with The Cincinnati Street Railway Company, a private corporation, contrary to Sec. 6 of Article VIII of the Ohio Constitution, prohibiting the passing of any law "authorizing any —— city —— to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or loan its credit to or in aid of, any such company, corporation or association."

This contention requires an analysis of this second ordinance. This is what it does:

(1) It grants to The Cincinnati Street Railway Company the right to operate the Price Hill Inclined Plane from the time the City acquires and rehabilitates it to November 1st, 1965, upon certain terms and conditions. (2) It obligates The Cincinnati Street Railway Company to operate and maintain the inclined plane as a part of its transportation system, and defines maintenance as including renewals and replacements and keeping properly in safe and efficient operating condition. (3) It requires The Cincinnati Street Railway Company to pay to the City of Cincinnati the sum of $3,000.00 "as its agreed portion of the cost of the repair of the inclined plane" immediately upon acquisition "and an additional $7,500.00 before entering upon the operation thereof; and in addition thereto shall pay all expenses of operation, maintenance and replacements and shall pay any tax which may lawfully be levied against said property or its operations, and insurance costs; and shall hold the City free and harmless from any liability arising out of the operations thereof." (4) All of the appropriate terms of the ordinance under which The Cincinnati Street Railway Company operated its street railway system were made applicable. (5) The fare was fixed at 5 cents with transportation at 12½ cents to the general street railway system.

Now does this ordinance provide for supplying money, extending credit, or otherwise violate Sec. 6 of Article VIII of the Constitution? Is it a "grant-in-aid" to The Cincinnati Street Railway Company?

By reading this ordinance and the bond ordinance either together or separately it is impossible to find any express provision that imposes any obligation upon the City of Cincinnati in favor of The Cincinnati Street Railway Company. And the only expenditure of money provided for is for the purchase and improvement of property, the title to which was to rest exclusively in the City of Cincinnati. The ordinance contemplates that the City will grant a right to operate its inclined plane for a term after it becomes the owner. It does

not even bind itself to buy or rehabilitate the inclined plane. The grant does not begin until it does buy and recondition. As the analysis shows all the obligations are on The Cincinnati Street Railway Company and not on the City. It is The Cincinnati Street Railway Company that becomes bound to contribute $10,500.00 to the repair of the property (Price Hill Inclined Plane) of the City of Cincinnati. It is true that the Price Hill Inclined Plane would then be operated by The Cincinnati Street Railway Company, without payment of any additional rent, but it would assume obligations that would involve expenditures of money and there is no evidence that the operation would be profitable or otherwise to it. The fact that the City of Cincinnati expends $75,000.00 to secure transportation service to and from a certain locality for twenty years is no evidence that it was contributing that money to the use of any corporation furnishing the service, or that the expenditure was improvident. Of course, in this instance for its expenditure it will secure title to the inclined plane in addition to the service for twenty years. A fair appraisal of the facts leads to the conclusion that this is a municipal enterprise, and not a private business venture to which it was contributing its money or credit in any way.

Many cases are found in which the Courts have had occasion to determine whether Sec. 6 of Article VIII had been violated. Some have held that the proposed plan was prohibited by it and that others were not. In each of these cases the decision turned upon the finding of the court as to the facts. In **Walker v Cincinnati, 21 Oh St 14,** the Court sustained the plan to build the Cincinnati Southern Railroad and then lease it to an operating company. It was held that this was not a violation of **Sec. 6** of **Article VIII,** and while the soundness of the decision has been questioned in other respects, it has been consistently approved and followed on this point. There is no substantial difference in the factual situation presented in that case and in the case at bar.

In **Taylor v Commrs. of Ross County, 23 Oh St 22,** the Court held that a plan whereby Ross County sought to encourage the building of railroads violated **Sec. 6** of **Article VIII.** The plan in effect provided that the county would start the construction, which would be completed by private persons or corporations by whom the road would be owned when completed. The plan would result in a pure donation. This was the view of the Court as shown by its remarks on pages 82 and 83, where it is said:

"The transaction which the statute authorizes, begins with

a railroad projected in the name of one of the localities mentioned, to be built in part by taxation, and end with a debt on the locality for its construction, and, if anything useful has been accomplished with the road being substantially owned by a railroad company, to be operated or not, or disposed of as such company may find most to its interest.

"This is accomplishing by indirection what it would be a plain violation of an express provision of the constitution to do directly. ·

"Where public credit or money is furnished, to be used in part construction of a work, which, under the statute authorizing its construction, must be completed, if completed at all, by other parties out of their own means, who are to own or have the beneficial control and management of the work when completed, the public money or credit thus used, can only be regarded, within the meaning of the constitutional provision in question, as furnished for, or in aid of such parties."

No such result can take place under the ordinances here under consideration. Cincinnati will own the Price Hill Inclined Plane outright at all times, and at the end of twenty years the grant of the right to operate will have expired and. Cincinnati may do with it as it pleases. And during the twenty years passengers will have been carried for the stipulated fare and without other cost to the municipality.

A similar defect existed in the plan under consideration in **Wyscover v Atkinson, 37 Oh St 80.** A township was authorized to expend $20,000.00 in the building of a railroal with the proviso that if the sum was found to be too small the railroad could be mortgaged to raise the money for its completion and provision was made for foreclosure of the mortgage. That and the fact that the township had no power to operate the railroad and the fact that $20,000.00 would be insufficient to even iron the tracks, to say nothing of the expense of the right of way, the grading, the tying, or the equipment led the court to conclude, as a matter of fact, that it was the intent to donate $20,000.00, and that through the device of a foreclosure of the mortgage, or in some other way, the entire title would inevitably pass into other hands as contemplated at the time. If such was the fact, it would clearly violate Sec. 6 of **Article VIII.**

That **Alter v Cincinnati, 56 Oh St 47,** bears no analogy to the case before us is shown by what the Court said at pages 66 and 67:

"The case is not like a city leasing a building or waterworks plant owned by another, because in such case the leased property would stand upon its own merits, and would not, before or after the lease, become merged into the other property of the city so that the whole would become one property, and make the property of the city dependent upon the leased property for its value and utility."

The quotation is an accurate general description of the facts presented in this case. Whether the municipality is lessee or lessor can make no difference in this respect. The Court approved of such an arrangement as not in violation of **Sec. 6** of **Article VIII.**

The plan for granting to The Cincinnati Street Railway Company the right to operate the subway in connection with its existing street car system was held in **State, ex rel. v The Cincinnati Street Ry. Co., 97 Oh St 283,** to violate **Sec. 6, Article VIII,** because of provision that the gross proceeds from the operation of both properties should be used for the payment of existing and thereafter issued securities of the company. And our understanding of the facts is that the gross proceeds from the properties for all time were pledged to the payment of existing and thereafter issued securities, and that the City of Cincinnati could not resume control and operation of the subway free of the obligation to apply the gross proceeds to the payment of the incurred indebtedness. That the Court had no intention of denouncing such an arrangement as here involved is shown by the remarks of the Court at page 305, that:

"So that we have here this situation:

"(a) The companies have and own a system of street railways already equipped and in operation.

"(b) The city proposes to construct and own a subway with all of the appurtenant properties described in the ordinance.

"(c) The city desires to contract for the operation of the subway to be owned by it so that the 'product of service' of the public utility may be 'supplied to the municipality and its inhabitants'."

This, the City is expressly empowered to do.

In **City of Cincinnati v Harth, 101 Oh St 344,** we have a case in which the municipality was about to expend public money to renew, replace, repair or reconstruct the rails, ties, roadbed or tracks of a street railway company. Upon completion the

title to this property would belong to the street railway company. The fact that the municipality provided a special assessment to reimburse itself only made clearer that it was a lending of its credit. At page 349, the Court said:

"When the city issues and sells its bonds and uses the money of the taxpayers for renewing, replacing, and reconstructing the rails, ties, roadbeds and tracks in the street, all of this new construction and new property belongs to the company, to be used and dealt with in every way that it can use and deal with any of its property. The only way provided by which the city is to be reimbursed is by assessing against the company the cost of the things it gives to and does for the company, in addition to the declaration of the statute that the amount of the cost shall be a lien on the property of the company. That is to say, it is a simple, plain loan by the city to the company of the amount of money needed for the purpose. The company becomes indebted to the city for the money the city has spent on the company's property. The company gets the property at once. It may borrow on it or sell it. The city has loaned its money and its credit to the company. It is the very thing that the constitution prohibits."

We have considered other cases involving **Sec. 6 of Article VIII, (The Ohio Traction Co. v Huwe, 127 Oh St 444; Village of Brewster v Hill, 128 Oh St 343; City of Newark v Fromholz, 102 Oh St 81)** and find nothing, in them contrary to the interpretation made in the cases which we have discussed. Perhaps, however, we should say something about Brewster v. Hill, supra. There the Village owned a small electrical distribution system and needed an electric generator. It arranged with a manufacturer to provide such for $24,000.00, of which $5,000.00 was payable in cash and the balance in 60 monthly instalments from the revenue of the system. The Village was to furnish the foundation and the building for the generator and all needed common labor. The title of the generator was to remain in the vendor until paid for. The Court held that this was a loaning of the credit of the Village. We need not consider whether it harmonizes with the other cases interpreting Section 6 of Article VIII. It is sufficient to say that there is no such commingling of property in this case. The Price Hill Inclined Plane will be a separate unit at all time capable of performing the public service for which it was intended. The City will receive the $10,500.00 contribution for its repair and the revenue derived by The Cincinnati Street Railway

Company will be its sole property. In the Brewster case both the Village and the manufacturer had an interest—a part title—in the generator. They were co-owners of specific property as conditional vendor and vendee. And as such the Village would have exposed its investment in the generator to all the hazards incident to enforcing the relative rights of conditional vendors and vendees and their respective creditors. See: Farmerville v. Commercial Credit Co., et al., 76 A. L. R. (La.), 686, and annotation. There is no such co-ownership in this case, and the title of the municipality to the Price Hill Inclined Plane is in no way exposed to vicissitudes of the business of The Cincinnati Street Railway Company. We find no raising of money for, or lending of credit, or co-ownership, or co-partnership in this proposal. **McGuire v Cincinnati, 35 Abs 423, 40 N. E. (2d), 435,** is cited in support of the plaintiff's contention. In that case, this Court sustained an arrangement whereby the operation of the Zoological Garden owned by Cincinnati was confided to Zoological Society, a non-profit corporation. We did so largely on the authority of **Walker v Cincinnati, 21 Oh St 14,** which sustained legislation authorizing the building of the Southern Railroad and the leasing of it to a corporation organized for profit. We find nothing in McGuire v. Cincinnati inconsistent with our holding in this case—just the contrary.

Entertaining these views it is our conclusion that the plaintiff has failed to prove a right to an injunction and a decree may be presented finding on the issues joined in favor of the defendants, and dismissing the plaintiff's action.

HILDEBRANT, PJ, MATTHEWS and ROSS, JJ, concur in syllabus, opinion and judgment.