THE STATE, EX REL. BOARD OF COUNTY COMMISSIONERS OF LAKE
COUNTY ET AL., APPELLANTS, *v.* ZUPANCIC, APPELLEE.

[Cite as *State, ex rel. Lake Cty. Bd. of Commrs.,
v. Zupancic* (1991), 62 Ohio St.3d 297.]

(No. 90–1615—Submitted September 18, 1991—Decided December 24, 1991.)

298

"***

Mastrangelo & Freda, E.W. Mastrangelo; Peck, Shaffer & Williams and John Weld Peck, for appellants.

Steven V. LaTourette, Prosecuting Attorney, and Michael P. Brown, for appellee.

WRIGHT, J. The sole issue before the court is whether the construction of for-profit, multiunit rental housing constitutes the construction of facilities for commerce or industry under Section 13, Article VIII, Ohio Constitution. The parties agree that if the proposed housing project meets the requirements of Section 13, the issuance of the bonds will meet constitutional muster, and the respondent auditor will be obligated to sign the bonds and affix his seal to them. For the reasons set forth below, we overrule State, ex rel. Brown, v. Beard (1976), 48 Ohio St.2d 290, 2 O.O.3d 438, 358 N.E.2d 569, and hold that construction of for-profit, multiunit, low- and moderate-income rental housing constitutes the construction of facilities for commerce and industry under Section 13. Accordingly, we hold that the proposed construction is a permissible project for which the relator board may issue bonds.

In Beard, we last addressed the issue of whether the construction of low- and moderate-income housing constituted commerce or industry as those terms are used in Section 13, Article VIII.[5] In a brief per curiam opinion, we summarily rejected the argument that "moderate and low cost housing is related to industry and commerce to such an extent as to fall within either of those constitutionally designated categories." Id., 48 Ohio St.2d at 292, 2 O.O.3d at 439, 358 N.E.2d at 570. Although the action in Beard concerned the

---

5. In Beard, we referred to the housing project therein as the construction of "moderate and low cost housing." Our reference to low- and moderate-income housing is meant to be synonymous with the terms used in Beard.

authority of the state to issue bonds for the construction and rehabilitation of multiunit housing under Section 4, Article VIII, and not the authority of a county to issue bonds for a similar project under Section 6, the issue decided in *Beard* —how Section 13 should be interpreted—is essentially the same as the issue presented in the case *sub judice.*

As the court of appeals correctly noted, *Beard* would dispose of the issue before us were we to allow it to stand. Much has transpired since our decision in *Beard,* and we now review that opinion with the benefit of fifteen years of experience and hindsight. Although we are reluctant to overturn well-established precedent, we are less so in the face of precedent wanting in reason and justification. As Justice Holmes succinctly stated in his concurring opinion in *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 254, 25 OBR 302, 311, 496 N.E.2d 699, 709:

" * * * It does no violence to the legal doctrine of *stare decisis* to right that which is clearly wrong. It serves no valid public purpose to allow incorrect opinions to remain in the body of our law. * * *"

We now see that *Beard,* with its conclusory language and its focus on construction activities rather than the postconstruction use of the housing units, was inartfully, if not wrongly, decided.

We begin our analysis with a consideration of what the legislature intended to include in the constitutional categories of commerce and industry when Section 13 was submitted to the voters for their subsequent approval. A long-standing rule of construction mandates that we consider the common and ordinary meaning of the terms contained within our Constitution in order to interpret them properly. *Cleveland Tel. Co. v. Cleveland* (1918), 98 Ohio St. 358, 368–369, 121 N.E. 701, 704.[6]

In *State, ex rel. Bd. of Commrs. of Preble Cty., v. Mong* (1984), 12 Ohio St.3d 66, 12 OBR 56, 465 N.E.2d 428, we turned to the lexicographers for assistance in defining the common and ordinary meanings of the terms "commerce" and "industry." In holding that farming constituted commerce and industry under Section 13, we relied upon the generally accepted definitions of "commerce" as "the buying and selling of goods" and "industry" as "the commercial production of goods." *Id.* at 67, 12 OBR at 57, 465 N.E.2d at 429, citing The American Heritage Dictionary (1979) 266, 672, and Webster's New World Dictionary (2 Ed.1982) 285, 719. Today, we look to the broader definitions of those terms to include the service industries that for some time

---

6. See, also, *Miami Cty. v. Dayton* (1915), 92 Ohio St. 215, 110 N.E. 726 (applying rules of statutory construction in construing a constitutional provision); cf. R.C. 1.42 (terms in statutes are to be interpreted according to their "common usage").

have formed a substantial part of our state's and nation's economies. Turning again to dictionaries, we find "commerce" defined as "[t]he exchange of goods, productions, or *property of any kind*" (emphasis added), Black's Law Dictionary (6 Ed.1990) 269,[7] and "industry" defined as "the commercial production and sale of goods and *services*" (emphasis added), American Heritage Dictionary (1981) 672.

In adopting those definitions, we conclude that relators' proposed project would constitute the construction of facilities for industry and commerce under Section 13. The exchange of money for possessory interests in the rental units certainly constitutes "commerce" as that term is commonly used and has been defined. Furthermore, the commercial service of providing and maintaining rental housing constitutes a service industry that would be promoted by the issuance of the bonds in question.[8] The proposed issuance of the bonds is proper under the Ohio Constitution.

Our view that the rental industry is commerce is certainly consistent with our prior decision in *Roosevelt Properties Co. v. Kinney* (1984), 12 Ohio St.3d 7, 12 OBR 6, 465 N.E.2d 421. In *Roosevelt*, we considered the question of whether a multiunit commercial apartment complex constituted residential property for the purposes of a tax reduction factor that was available only to owners of residential property. In holding that the multiunit complexes at issue were not residential, we relied upon our view that the owner's use of the apartments was "singularly commercial in nature," *id.* at 12, 12 OBR at 10, 465 N.E.2d at 426, and that such properties are "utilized in a business or commercial capacity." *Id.* at 13, 12 OBR at 11, 465 N.E.2d at 426. For similar reasons we view relators' proposed construction project as unequivocally commercial and industrial in nature.

---

7. This definition of commerce is consistent with the United States Supreme Court's use of the term in a different context. In determining the applicability of the Sherman Act to legal services, the Supreme Court held that "the examination of a land title is a service, [and] the exchange of such a service for money is 'commerce' in the most common usage of that word. * * *" *Goldfarb v. Virginia State Bar* (1975), 421 U.S. 773, 787–788, 95 S.Ct. 2004, 2013, 44 L.Ed.2d 572, 585. Analogously, the provision of rental housing is a service, and the exchange of that service for rent is commerce. See, also, *Stark Cty. v. Ferguson* (1981), 2 Ohio App.3d 72, 75–76, 2 OBR 81, 84, 440 N.E.2d 816, 820 (construing commerce under Section 13 as incorporating an office building for physicians, dentists, a medical laboratory and a public pharmacy).

8. We choose not to travel down the path we took in *Beard* and do not consider whether the construction itself constitutes the construction of a facility for commerce and industry. Our reading of the statute focuses instead on the activities that will occur once construction is completed rather than those occurring during the construction itself.

We are mindful that since *Beard,* and in response thereto, the electorate has twice amended Article VIII to include provisions, Section 14 and Section 16, that broaden the authority of the state and its political subdivisions to assist in the construction of housing within the state. Section 14 allows the state to issue bonds for multiunit housing for persons over the age of sixty-two, and for single-family, owner-occupied dwellings. Section 16, which became operative on September 1 of this year, permits the state and political subdivisions to make grants, loans, subsidies to loans, loans to lenders, purchase of loans, and guarantees of loans to aid the housing industry in Ohio, and permits the state to issue bonds for that purpose. Appellee auditor argues that the narrow focus of these subsequent amendments indicates that the people of Ohio never intended counties to have the authority to issue bonds to support loans to construct rental housing under Section 13. Had the people wanted the counties to have such authority, the auditor contends, they would have amended the Constitution accordingly.

We find it difficult, however, to draw such conclusions, for "this court places little weight on legislative [or in this case, electoral] inaction as a barometer for determining legislative intent." *Roosevelt, supra,* 12 Ohio St.3d at 10–11, 12 OBR at 9, 465 N.E.2d at 425. For the past fifteen years, the people of this state have been led to believe by our pronouncement in *Beard* that the rental industry does not meet Section 13's requirements. Through the adoption of Sections 14 and 16, the people of Ohio have indicated that the construction of rental housing is in the public interest and a proper public purpose, and they have begun, in a piecemeal fashion, to address the restrictions imposed by *Beard.*

We cannot now assume that the people would have amended the Constitution in the same manner had *Beard* not arisen. Nor can we assume that their incremental process of overturning *Beard* by referendum would have stopped with the passage of Sections 14 and 16. We can only assume that had we decided *Beard* properly in 1976, the thrust of Sections 14 and 16 might have been different.[9]

Accordingly, we reverse the decision of the court of appeals and reinstate the judgment of the trial court and its issuance of a writ of mandamus.

*Judgment reversed.*

---

9. This is not to suggest that our decision today would render either of these provisions moot, because we are here concerned with the construction of multiunit, low- and moderate-income housing where a profitable exchange of rent money for services takes place. Any other facility that does not share these attributes would not necessarily fall within the narrow scope of this decision or the provisions of Section 13. The authority to issue bonds for such projects would likely have to arise under Sections 14 and 16.

SWEENEY, HOLMES, DOUGLAS and RESNICK, JJ., concur.

MOYER, C.J., and H. BROWN, J., dissent.

MOYER, C.J., dissenting. I respectfully dissent. Section 6, Article VIII of the Ohio Constitution prohibits political subdivisions from issuing bonds in aid of private enterprise, and the project at issue does not fall within the exceptions to Section 6 found in Section 13, Article VIII.

Section 13, Article VIII of the Ohio Constitution authorizes the state and its political subdivisions to issue bonds for construction of property for specifically enumerated purposes. Section 13 does not authorize bonds for the construction of a housing complex such as that attempted by appellants. This was the holding in *State, ex rel. Brown, v. Beard* (1976), 48 Ohio St.2d 290, 2 O.O.3d 438, 358 N.E.2d 569, the case which the majority overrules. The majority holds that *Beard* was incorrectly decided because the General Assembly actually intended to include bonds for for-profit, multiunit, low- and moderate-income housing when Section 13 was submitted to the voters for ratification. Such an analysis is unnecessary when, as in this case, a statute or constitutional provision is not ambiguous. Yet, the majority looks beyond the wording of Section 13 and concludes that the common usage of the words "commerce" and "industry" and the history of constitutional amendments over the last fifteen years demonstrate a desire for a broader interpretation of Section 13.

In addition to the fact that the question is answered by the plain language of Section 13 and the *Beard* decision, a review of the constitutional history reveals no intent to broaden the activities for which political subdivisions may provide funds by the issuance of bonds.

The majority suggests that "[t]hrough the adoption of Sections 14 and 16, the people of Ohio have indicated that the construction of rental housing is in the public interest and a proper public purpose * * *." That may be, but the people did not determine that such public interest includes the issuance of bonds by a board of county commissioners for the purpose of constructing low- and moderate-income rental housing. The majority misinterprets the implication of these amendments to Article VIII. As this court stated in *State, ex rel. Engle, v. Indus. Comm.* (1944), 142 Ohio St. 425, 432, 27 O.O. 370, 373, 52 N.E.2d 743, 747:

"The general rule as to the interpretation of constitutional amendments may be stated thus: The body enacting the amendment will be presumed to have had in mind existing constitutional or statutory provisions and their judicial construction, touching the subject dealt with."

The adoptions of Sections 14 and 16, which have broadened the power of the state, but not boards of county commissioners, to issue bonds for housing projects, have occurred since this court's decision in *Beard*. As this court stated in *Engle*, the restrictions in the Constitution and made by judicial interpretation are presumed to be known by those enacting an amendment. With this knowledge of the restrictions in *Beard*, the General Assembly drafted and the people ratified amendments that created only limited expansion of the exception to Section 13. Such a conclusion is consistent with this court's disposition of an issue regarding the General Assembly's amendment of a statute following a decision of the court. In *State, ex rel. Huron Cty. Bd. of Edn., v. Howard* (1957), 167 Ohio St. 93, 95–96, 4 O.O.2d 83, 84, 146 N.E.2d 604, 606–607, the court observed:

"Since that decision, the General Assembly has met many times. These sections have been amended, and in 1943 the school code was completely recodified, and yet the General Assembly has not seen fit to change this particular phraseology.

"Bearing in mind that a legislative body in enacting amendments is presumed to have in mind prior judicial constructions of the section, we reach the inescapable conclusion that the General Assembly intended that only one school district could be transferred in a single resolution."

The court's analysis in *Huron* is equally applicable where the General Assembly places on the ballot amendments to the Ohio Constitution. Since the *Beard* decision in 1976, Article VIII has been amended to include Sections 14 and 16. In 1977 and 1980, the voters rejected two ballot proposals that would have permitted the state and political subdivisions to make loans to private, for-profit borrowers to provide multiunit rental housing for low- and moderate-income persons. See Am.Sub.H. Joint Resolution No. 18, 137 Ohio Laws, Part II, 4050, and Am.Sub.H. Joint Resolution No. 60, 138 Ohio Laws, Part II, 4979.

Neither of those adopted amendments authorizes a county to issue bonds to construct low- or moderate-income housing projects. However, the rejected amendments would have authorized such projects. Thus, when the General Assembly intended to give such authority to counties, it expressly stated its intent.

The adoption of constitutional amendments which allow specific exceptions to Section 6, Article VIII does not show intent by the public or the General Assembly to broaden the scope of Section 13 to allow the issuance of bonds by political subdivisions of the state for low- or moderate-income housing projects. This type of assertion has previously been rejected by this court in *Lynn v. Supple* (1957), 166 Ohio St. 154, 1 O.O.2d 405, 140 N.E.2d 555. The

court addressed such an argument with respect to the withdrawal of names from municipal referendum petitions. The court stated:

"Relator argues that the foregoing authorities should no longer be followed because of the subsequent enactment in 1941 of Section 4785–177a, General Code (now Section 3519.11, Revised Code), specifically providing for withdrawal of names from referendum petitions relating to statutes in certain instances and because of the failure of the General Assembly to enact a similar provision relating to municipal referendums.

"There might be some force to such an argument if the statutes relating to municipal referendums had not been previously enacted, and also if they had not been previously construed by this court as permitting the withdrawal of names of signers. However, we do not believe that we can imply an intention of the General Assembly to provide against withdrawal of names of signers from a municipal referendum petition merely because it made no provision for such withdrawal at a time when it was providing for such withdrawal with respect to state referendum petitions, especially when it was not then legislating relative to municipal referendum petitions. If, by what it does, the General Assembly intends in effect to change the law as previously announced by this court, it should express such an intention. Such an intention will not ordinarily if ever be implied from its silence." *Id.* at 159, 1 O.O.2d at 408, 140 N.E.2d at 559.

For the foregoing reasons, I would affirm the judgment of the court of appeals.

H. BROWN, J., concurs in the foregoing dissenting opinion.