**The STATE of Ohio, Plaintiff,**

**v.**

**RODGERS, Defendant.**

2005-Ohio-1730.]

Court of Common Pleas of Ohio,
Franklin County, Criminal Division.

No. 05CR–269.

Decided March 29, 2005.

Ron O'Brien, Franklin County Prosecuting Attorney, and Keith McGrath, Assistant Prosecuting Attorney, for plaintiff.

Michael D. Winston, for defendant.

FRYE, Judge.

*Introduction*

{¶ 1} Defendant, Terry Rodgers, is charged with the felony of domestic violence, pursuant to R.C. 2919.25, in that he allegedly knowingly caused or attempted to cause physical harm to a family or household member, named Barbara Thomas. The indictment alleges that the crime occurred on December 30, 2004.

{¶ 2} Defendant moved to dismiss the charges, contending that Ohio's domestic-violence statute violates a newly adopted provision in the Ohio Constitution commonly referred to as the "Marriage Amendment." The state of Ohio has responded to the motion, and the court has heard oral arguments. The Office of the Attorney General was invited, but declined to participate as amicus curiae.

*Procedural Status*

{¶ 3} The state argues that this court should not entertain this motion before trial. It asserts the rule that a constitutional question should not be addressed until it is absolutely necessary and that, under the domestic-violence statute, factual determinations necessarily are made on a case-by-case basis, such that only after a trial can the factual context in which the statute is being applied be clear.

{¶ 4} For both procedural and substantive reasons the court disagrees with the state. In bringing his motion, defendant concedes that "the alleged victim and the Defendant lived together at the time of the alleged offense, but were not married nor do they have children in common." In addition, in open court the defendant conceded these facts. Only by making such admissions of fact can defendant argue that he is entitled to challenge the statute under which he is charged, premised upon the Marriage Amendment, since he argues that the Ohio Constitution now "clearly prevents the State of Ohio from recognizing any legal relationship between unmarried individuals, enhancing penalties for actions otherwise provided for in the statutory code." Id.

{¶ 5} Ohio criminal practice permits a defendant to challenge an indictment through a pretrial motion filed under Crim.R. 12(C). One may do so whenever such a motion is "capable of determination without the trial of the general issue." Under Crim.R. 12(F) the court may adjudicate a motion based upon briefs, the proffer of testimony, a hearing, "or other appropriate means." In this case the factual record has been sufficiently developed. The court is instructed by Crim.R. 12(F), moreover, to determine any such motion before trial "whenever possible." Thus, while recognizing that there is no counterpart to Civ.R. 56 in criminal practice, the factual admissions by defendant sufficiently frame the

inquiry to allow the adjudication of his challenge to the constitutionality of the statute under which he is charged.

{¶ 6} It also merits mention that, even if defendant hereafter elected to enter a counseled plea of guilty to this domestic-violence charge, his conviction would not preclude an attack on the constitutionality of this statute. *State v. Wilson* (1979), 58 Ohio St.2d 52, 12 O.O.3d 51, 388 N.E.2d 745, syllabus; *State v. Atchley*, 10th Dist. No. 04AP–841, 2005-Ohio-1124, 2005 WL 590696, at ¶ 15, citing *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, at ¶ 78–79. Accordingly, the court believes that it has the obligation to address this motion to dismiss and not defer the question pending trial or a possible guilty plea.

*The Domestic–Violence Statute*

■ {¶ 7} The indictment alleges that defendant, on or about December 30, 2004, in violation of R.C. 2919.25, knowingly caused or attempted to cause physical harm to a family or household member, to wit: Barbara Thomas, that defendant had previously been convicted of aggravated menacing on June 5, 2003, a violation of R.C. 2903.21, involving a person who was a family or household member at the time of the violation, and that defendant had previously been convicted of assault on February 5, 2003, a violation of R.C. 2903.13, involving a person who was a family or household member at the time of the violation.

{¶ 8} The domestic-violence statute punishes what would, otherwise, be essentially an assault and battery. Originally adopted in 1979, and frequently amended over subsequent years, R.C. 2919.25 protects a more limited class of victims than general assault laws. Thus, an element of the offense is causing or attempting to cause "physical harm to a family or household member." "Family or household member" is a defined term. It includes one who is "residing or has resided with" the alleged offender, and who is either a "spouse, [or] a person living as a spouse." R.C. 2919.25(F). It also includes a parent or child of the alleged offender or another person related by consanguinity or affinity to the offender, or to their spouse, a person living as a spouse, or a former spouse. The same term also protects the "natural parent of any child of whom the offender is the other natural parent or is the putative other natural parent." R.C. 2919.25(F)(1)(b). This is a diverse class of protected persons.

{¶ 9} "Person living as a spouse" is a defined term. R.C. 2919.25(F)(2). It means "a person who is living or has lived with the offender in a common law marital relationship,[1] who otherwise is cohabiting with the offender, or who * * * has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." "Cohabitation" is not defined in the statute.

---

1. Common-law marriage was outlawed in Ohio only recently. R.C. 3105.12, adopted in 1991.

However, R.C. 2919.25 has never been interpreted narrowly *or* restricted to protecting only those in a traditional heterosexual marriage. The leading decision under the statute is *State v. Williams* (1997), 79 Ohio St.3d 459, 683 N.E.2d 1126. *Williams* clarified the essential elements of domestic violence; specifically, it addressed what type of conduct constituted "cohabitation" under the law.

{¶ 10} The *Williams* court noted the wide range of definitions of "cohabitant" in the context of domestic violence developed by various courts of appeals. The definitions applied by the lower courts, although various, were consistent in holding that "domestic violence arises out of the nature of the relationship itself." *Williams*, supra, at 464, 683 N.E.2d 1126. The broad reach and purpose of the domestic-violence statute is supported by the court's inclusion of statistics on violence in relationships other than marriage, such as premarital dating. This supported the holding that the lack of marital status did not somehow eliminate the protection this statute seeks to provide. Additionally, the *Williams* court rejected the defendant's argument for narrowly defining the term "reside" in a way that would restrict the statute's protection only to individuals living in a single residence.

{¶ 11} In *Williams*, the court addressed what conduct constituted "cohabitation" under the law by articulating two factors that must be present in such a relationship: (1) sharing of familial or financial responsibility and (2) consortium. Id. at 465, 683 N.E.2d 1126. The court found that cohabitation existed between Williams and the victim, even though both parties contended that they were not married, had never been married, and had not lived together in common-law marriage. The court found cohabitation existed because on most nights the victim stayed at Williams's residence and the two shared financial responsibilities and conjugal relations.

{¶ 12} The existence of cohabitation within a relationship is a factual determination that must be made on a case-by-case basis. A relationship can exist between any two individuals as illustrated in *State v. Hadinger* (1991), 61 Ohio App.3d 820, 573 N.E.2d 1191. In that case, two women were living together in a "spousal relationship," in which one woman attacked the other woman and inflicted harm by biting the victim's hand. The court held that the domestic-violence statute provided protection for cohabitating individuals, regardless of their sex, and that to do otherwise "would eviscerate the efforts of the legislature to safeguard, regardless of gender, the rights of victims of domestic violence." Id. at 823, 573 N.E.2d 1191.

{¶ 13} Not all relationships rise to the level of cohabitation. In *Middletown v. Walker* (1995), 107 Ohio App.3d 516, 669 N.E.2d 69, the court found that cohabitation did not exist when two individuals dated for a period of four years yet maintained separate residences. Furthermore, just spending time together

in one location or sharing money is not enough to reach the level of cohabitation. A case that aptly illustrates this is *State v. Cobb*, 153 Ohio App.3d 541, 2003-Ohio-3821, 795 N.E.2d 73, in which the complainant alleged that the appellant had pushed and made verbal threats against her in his residence. The two individuals had been dating, occasionally shared money, and spent the night at each other's residences. The court, nonetheless, found that cohabitation did not exist because they did not share familial or financial responsibilities at a necessary level of regularity. Therefore, in determining cohabitation, some form of consistency or regularity must be present for reasonable minds to conclude that cohabitation exists.

{¶ 14} It is evident that while "cohabitation" defines a relationship between people, that status is factual not legal. "Cohabitant" is therefore not a legal status, let alone a legal status that "intends to approximate the design, qualities, significance or effect of marriage" within the meaning of the Marriage Amendment.

*The Marriage Amendment of 2004*

{¶ 15} Adopted by the voters of Ohio on November 2, 2004, the Marriage Amendment is codified in Section 11, Article XV of the Ohio Constitution. It became legally effective 30 days after adoption. Section 1b, Article II, Ohio Constitution; see, also, *State ex rel. Duffy v. Sweeney* (1949), 152 Ohio St. 308, 40 O.O. 358, 89 N.E.2d 641. Section 11, Article XV provides:

> Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions. This state and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance or effect of marriage.

{¶ 16} The language of the Marriage Amendment has breadth, but it is unclear in reading the amendment whether its drafters intended to affect anything other than how "marriage" is defined as an institution in Ohio. The Marriage Amendment was initiated by the Ohio Campaign to Protect Marriage and was not the product of the legislative process. Thus, there is no legislative history generated by the Ohio General Assembly that squarely interprets the Marriage Amendment.

{¶ 17} The question presented is whether the second sentence was included in the amendment only to prevent "anyone—be it by judicial legislative or executive means—[from] creating any marital-type relationship and just calling it some-

thing else such as a 'civil union' or 'domestic partnership.' "[2]  Ohio Campaign to Protect Marriage, *The Facts About Issue* 1 at http://www.ohiomarriage.com/Legal_Issues_&_News.shtml (last visited March 24, 2005).  The official ballot argument written by Issue 1 proponents specifically stated, "Issue 1 does not interfere in any way with the individual choices of citizens as to private relationships they desire to enter and maintain."  The court notes that while these statements are the opinions of the proponents who used the initiative process, they help the court interpret what would otherwise be unclear.  In contrast, the court does not believe that statements of those who opposed Issue One (as this amendment appeared on the ballot) have value in a situation like this.  Opponents' views are not necessarily motivated by concerns of legal accuracy as opposed to preelection hyperbole.

*General Rules of Constitutional Interpretation*

{¶ 18} The issue presented to the court is whether R.C. 2919.25 is unconstitutional in light of the second sentence in the 2004 Marriage Amendment.  In determining the meaning of a constitutional provision under Ohio law, the court first looks to the language of the provision itself.  Ordinarily, language used in the Constitution is given its "usual, normal, or customary meaning." *State ex rel. King v. Summit Cty. Council,* 99 Ohio St.3d 172, 2003-Ohio-3050, 789 N.E.2d 1108, at ¶ 35;  *Toledo Edison Co. v. Bryan* (2000), 90 Ohio St.3d 288, 292, 737 N.E.2d 529.

{¶ 19} In general, Ohio courts use the same rules of interpretation for interpreting the Constitution as are used for interpreting statutes.  Therefore, "[i]f the meaning of a provision cannot be ascertained by its plain language, a court may look to the purpose of the [constitutional] provision to determine its meaning." *State v. Jackson,* 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, ¶ 14, citing *Castleberry v. Evatt* (1946), 147 Ohio St. 30, 33 O.O. 197, 67 N.E.2d 861, paragraph one of the syllabus.  In addition to the purpose of the provision, when interpreting legal language which is unclear, Ohio courts may consider the circumstances surrounding the provision, the legislative history, and the consequences of a particular construction.  R.C. 1.49.

{¶ 20} Here, a statute enacted in 1979 is being measured against a later constitutional amendment.  A subsequent constitutional amendment may expressly provide for the repeal of inconsistent statutes already on the books.  16 Ohio Jurisprudence 3d (2001) 190, Constitutional Law, Section 39, citing *State ex rel. Rose v. Donahey* (1919), 100 Ohio St. 104, 125 N.E. 908.  The 2004 Marriage

2.  Views of the Marriage Amendment's proponents would not be legally relevant but for the fact that the drafter's intent is not clear from the language of the amendment itself.  See *Cleveland Trust Co. v. Eaton* (1970), 21 Ohio St.2d 129, 133, 50 O.O.2d 354, 256 N.E.2d 198.

Amendment did not contain any express language repealing inconsistent acts of the General Assembly, suggesting its drafters did not contemplate that the new provision would invalidate existing statutes. Yet Ohio law does not compel that conclusion. Although repeals by implication are not favored, a finding of statutory repeal by implication based upon a newly adopted constitutional provision can sometimes occur. 16 Ohio Jurisprudence 3d (2001) 194, Constitutional Law, Section 45; *Ohio ex rel. Evans v. Dudley* (1853), 1 Ohio St. 437, 441, 1853 WL 50. But "if any reasonable construction may be given to each so that both may stand, such construction must be given." See *State ex rel. Smead v. Union Twp.* (1858), 8 Ohio St. 394, 399, 1858 WL 30 (holding that repeals by implication are disfavored as between constitutional amendments and previously existing statutes).

█ {¶ 21} Before a statute may be found unconstitutional there must be a "clear incompatibility between the law and the Constitution * * *. The repugnancy between the statute and the Constitution must be incapable of a fair reconciliation." *State ex rel. Michaels v. Morse* (1956), 165 Ohio St. 599, 603–604, 60 O.O. 531, 138 N.E.2d 660; see, also, *Johns v. Univ. of Cincinnati Med. Assoc., Inc.*, 101 Ohio St.3d 234, 2004-Ohio-824, 804 N.E.2d 19, ¶ 34. It is also important to note that, under the Ohio Constitution, the General Assembly may enact any law that is not prohibited by the state or federal Constitution. In reading the Marriage Amendment, the language used appears to address only a "limitation upon political power" with respect to how "marriage" is defined as a relationship in this state. The language used does not by its terms impose any limitation on how criminal laws are written. As interpreted in Ohio courts, the criminal prohibition in R.C. 2919.25 does not relate to how "marriage" is defined in Ohio. Indeed, it would be peculiar to use the criminal code to define marriage or any other legal status.

█ {¶ 22} Finally, "a constitutional provision alone has no force unless it is self-executing. A constitutional provision is self-executing if it supplies a sufficient rule by which the protection that it affords can be enforced without legislative enactment." *Jackson,* at ¶ 22. Simply put, to be self-executing, an amendment must specifically provide for immediate enjoyment of benefits (or enforcement of prohibitions) without further legislative action. *In re Protest Filed by Citizens for Merit Selection of Judges* (1990), 49 Ohio St.3d 102, 104, 551 N.E.2d 150. Against this backdrop of general constitutional law in Ohio, the Marriage Amendment appears to have only one purpose that can be said to be self-executing. The second sentence limits legislative authority to redefine marriage, with a term like "civil union," to approximate a traditional, heterosexual marriage. The language used is clearly self-executing when read in that limited manner.

{¶ 23} Conversely, in the absence of a precise standard subject to judicial enforcement a provision in the Ohio Constitution is not self-executing. *In re Merit Selection of Judges*, supra, 49 Ohio St.3d at 104, 551 N.E.2d 150; *State v. Williams* (2000), 88 Ohio St.3d 513, 522, 728 N.E.2d 342. If the court embraced defendant's argument that portions of other laws were implicitly extinguished by the Marriage Amendment, the uncertainty of the wording would be problematic,[3] and the court would hold in those broader circumstances the Marriage Amendment is not self-executing.

### The National Backdrop for the Ohio Marriage Amendment

{¶ 24} As noted previously, Ohio law provides that if some ambiguity is present in a constitutional provision a court may consider the origin and background for the provision. In another recent decision considering this same question under the Marriage Amendment, Cuyahoga County Common Pleas Judge Stuart A. Friedman ruled that the second sentence of the Marriage Amendment is clear, in reaching his decision that the adoption of that amendment invalidated the domestic-violence law. *State v. Burk* (Mar. 23, 2005), Cuyahoga C.P. No. CR 462510, 2005 WL 786212. This court does not agree. There are at least two possible interpretations of the words in the second sentence of the 2004 amendment. One, given by Judge Friedman, would hold that the wording clearly invalidates any statute that touches on "marriage" or that for any purpose whatsoever, recognizes a relationship not strictly confined to one man and one woman who are formally married. This court believes that an alternative understanding of the words is credible and does not find the second sentence absolutely clear on its face. When language used has two alternative meanings, the law allows a court to look beyond the language and consider the origin and background for the provision. After doing so, this court concludes that the second sentence was intended to have no wide-ranging impact. It simply reinforces the strict legal definition of "marriage" set out in the first sentence of the 2004 amendment.

{¶ 25} The narrow focus of the Marriage Amendment is evident from the context in which it was adopted. The Marriage Amendment in Ohio arose from the national debate over same-sex "marriage," sometimes called "civil unions." Litigation in Hawaii in 1993 held that denying marriage licenses to same-sex couples was gender discrimination in violation of that state's Constitution, which shortly thereafter was amended, effectively nullifying that judicial decision. Thereafter, state courts in Alaska, Vermont, and Massachusetts "ignited what

---

3. To the extent it is proper to consider it in this context, it is beyond dispute that critics of the Marriage Amendment prior to the November 2004 election invariably pointed to the second sentence as vague and imprecise, stressing the risk of unintended consequences.

Senate Majority Leader Bill Frist has called a 'wildfire' of same-sex marriages in cities and towns around the nation." Note, Litigating the Defense of Marriage Act: The Next Battleground for Same–Sex Marriage (2004), 117 Harv.L.Rev. 2684, 2687; see, generally, Constitutional Law—Due Process Clause—Massachusetts Supreme Judicial Court Holds That Opposite–Sex Marriage Law Violates Right To Marry (2004), 117 Harv.L.Rev. 2441.

{¶ 26} After several years of legal developments, the United States Congress passed the Defense of Marriage Act ("DOMA") in 1996, reportedly amending en masse some 1,049 federal laws. Litigating the Defense of Marriage Act, supra, at 2684 (referencing Pub.L. No. 104–199, codified at Section 7, Title 1, U.S.Code and Section 1738C, Title 28, U.S.Code). The federal DOMA was followed by a statutory counterpart enacted in Ohio in 2004. R.C. 3101.01(C). The Ohio DOMA statute provides:

(3) The recognition or extension by the state of the specific statutory benefits of a legal marriage to nonmarital relationships between persons of the same sex or different sexes is against the strong public policy of this state. Any public act, record, or judicial proceeding of this state, as defined in section 9.82 of the Revised Code, that extends the specific statutory benefits of legal marriage to nonmarital relationships between persons of the same sex or different sexes is void ab initio. Nothing in division (C)(3) of this section shall be construed to do either of the following:

(a) Prohibit the extension of specific benefits otherwise enjoyed by all persons, married or unmarried, to nonmarital relationships between persons of the same sex or different sexes, including the extension of benefits conferred by any statute that is not expressly limited to married persons, which includes but is not limited to benefits available under Chapter 4117 of the Revised Code.

(Emphasis added.) The Ohio General Assembly expressed the intent behind this 2004 statute in uncodified Section 3 of the bill:

(B) The General Assembly declares its intent to define marriage and clarify that relationships that are intended as substitutes for marriage, including but not limited to "civil unions" as provided for in Vt. Stat. Ann. tit. 15, § 1202 (2003), will not be recognized in this state. It is not the intent of the General Assembly to prohibit the extension of specific benefits otherwise enjoyed by all persons, married or unmarried, to relationships between persons of the same sex or different sexes.

(Emphasis added.)

{¶ 27} The common thread in all of these developments was whether "marriage" embraced same-sex couples or was instead limited to one man—one woman couples. The literature on these judicial and legislative actions does not address domestic violence, much less suggest that an intended consequence of

recent efforts to specifically define "marriage" was to narrow protection against domestic violence in the criminal law.

{¶ 28} Ohio was among a number of states that adopted some form of Marriage Amendment at the November 2004 general election. Although the national discussion of how "marriage" is defined has relevance in determining the intentions of Ohio voters, two developments within Ohio are even more significant to understanding the opaque language in the second sentence of the Ohio Amendment. First, as mentioned above, the General Assembly adopted R.C. 3101.01(C). Earlier in 2004, uncodified Section 3 of the statute addressed the substitutes for "marriage," including but not limited to "civil unions" as provided for in Vt.Stat.Ann., Title 15, Section 1202 (2003). This court concludes that this purpose is also reflected in the second sentence of the Marriage Amendment. The second portion of the Marriage Amendment is most readily understood as a thesaurus, being an attempt to address any "legal status * * * that intends to approximate * * * marriage" or, in the words of the statute, any status that serves as a "substitute[ ] for marriage." This does not compel the conclusion that every "legal status" between one man and one woman other than a formal marriage ceases to exist, so long as that "legal status" is not substantially equivalent to "marriage." Business partnerships, for instance, can hardly be thought to be outlawed in Ohio even though they create a "legal status" that coincidentally approximates the effect of marriage by protecting rights of joint property ownership. Likewise, couples may have adoption rights without approximating the effect of marriage respecting children.

{¶ 29} The second development in Ohio that informs the most sensible understanding of the Marriage Amendment are the decisions in *Hadinger*, 61 Ohio App.3d 820, 573 N.E.2d 1191, and *State v. Linner* (1996), 77 Ohio Misc.2d 22, 665 N.E.2d 1180. The *Linner* court pointed out that the legislature was fully aware some years ago of same-sex cohabitation and held that the criminal statute prohibits domestic violence against "all persons regardless of their gender." Id. at 25, 665 N.E.2d 1180. Ohio's domestic-violence laws have existed since 1979. Ohio courts have consistently construed these laws broadly to protect unmarried individuals—gay or straight. See *Hadinger* and *Linner*, supra (holding that domestic-violence laws apply equally to all persons regardless of gender). The proponents of the Marriage Amendment were undoubtedly aware of Ohio's broad statutory protections against domestic violence, but did not suggest that their amendment would interfere with such legal protections.

{¶ 30} In construing amendments, Ohio courts presume that the body enacting the amendment is aware of existing constitutional and statutory provisions and their judicial construction. *State ex rel. Bd. of Cty. Commrs. v. Zupancic* (1991), 62 Ohio St.3d 297, 303, 581 N.E.2d 1086. Therefore, had the

proponents intended to alter Ohio's domestic-violence law, they would have drafted the Marriage Amendment accordingly. It was readily apparent by 2004 that Ohio's domestic-violence law referred to, but did do not create, a legal status that approximates marriage. Thus, the Marriage Amendment did not override R.C. 2919.25 by implication, because when the Marriage Amendment and the statute are both given a reasonable construction they can both coexist. Finally, to the extent that the Marriage Amendment does more than merely define "marriage" and limit the power of the legislature to expand upon that definition of "marriage," it is not self-executing.

*Conclusion*

{¶ 31} The defendant's motion to dismiss is denied.

Motion denied.