The STATE of Ohio, Appellant,

v.

WARD, Appellee.

[Cite as *State v. Ward,* 166 Ohio App.3d 188, 2006-Ohio-1407.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 2005–CA–75.

Decided March 24, 2006.

William F. Schenck, Greene County Prosecuting Attorney, and Elizabeth A. Ellis, Assistant Prosecuting Attorney, for appellant.

Ellen C. Weprin, for appellee.

FAIN, Judge.

{¶ 1} This appeal concerns the issue of whether the provision in the domestic-violence statute, R.C. 2919.25(F)(1)(a)(i), extending the protections of that criminal statute to "a person living as a spouse" offends the Defense of Marriage Amendment to the Ohio Constitution adopted by the voters in 2004, Section 11, Article XV, because it recognizes "a legal status for relationships of unmarried individuals that intends to approximate the * * * effect of marriage." We conclude that it does. Consequently, we conclude that the trial court did not err in dismissing defendant-appellee Karen Ward's indictment for domestic violence upon that ground.

## Background

{¶ 2} The state alleges that Ward assaulted her "live-in boyfriend," Fred A. Almonds Jr. She was arrested and ultimately charged by indictment with one count of domestic violence as a felony of the fourth degree.

{¶ 3} Ward moved to dismiss the charge against her, contending that the provision in the domestic-violence statute extending its protections to "a person living as a spouse," upon which the indictment is based, violates the recently-adopted Defense of Marriage Amendment. The trial court agreed with Ward and dismissed the indictment. The state appeals.

{¶ 4} Although no briefs of amicus curiae have been filed in this case, we are presently entertaining a number of appeals involving this precise issue in which four briefs of amicus curiae have been filed. We have considered those briefs, all of which have been helpful, in deciding this appeal. They are (1) the brief of the ACTION Coalition of Battered Women, the Ohio Domestic Violence Network, and the Ohio NOW Education and Legal Fund, filed June 6, 2005, in support of the state of Ohio in *State v. Steinman,* Greene App. No. 2005–CA–0046; (2) the brief of the Lambda Legal Defense and Education Fund, Inc., filed June 7, 2005,

in support of the state of Ohio in the same cause; (3) the brief of the Citizens for Community Values, filed August 23, 2005, in support of the defendant-appellant in *State v. McIntosh,* Montgomery App. No. 21093, 2006-Ohio-1815, 2006 WL 925179; and (4) the brief of the American Civil Liberties Union of Ohio Foundation, Inc., filed October 7, 2005, in support of the state of Ohio in *State v. McIntosh,* supra. Some of these amicus briefs raise issues that have not been raised by the parties either in the trial court or in this court—e.g., that the Defense of Marriage Amendment violates the Supremacy and Equal Protection clauses of the United States Constitution. Because these issues were not raised in the trial court, we deem them waived and do not reach them.

{¶ 5} Obviously, we have also considered the briefs of Ward and the state.

### The Assignment of Error

{¶ 6} "The trial court erred as a matter of law when it declared Revised Code Section 2919.25, unconstitutional, as it relates to cohabitating partners, pursuant to Article 15, Section 11 of the Ohio Constitution."

{¶ 7} This is an issue of first impression for this court. Impressive judicial authorities have already reached opposite conclusions on this issue. See, e.g., *State v. Newell,* 2005-Ohio-2848, 2005 WL 1364937, finding no constitutional violation, and *State v. Burk* (March 23, 2005), Cuyahoga Common Pleas No. CR–462510, 2005 WL 786212, finding a constitutional violation. The members of the panel deciding this appeal have reached opposite conclusions. Obviously, the Supreme Court of Ohio will ultimately be called upon to decide this issue.

### Principles of Constitutional Construction

{¶ 8} In its amicus brief, the American Civil Liberties Union of Ohio appears to be arguing that where there is a potential conflict between a statute and the Ohio Constitution, not only must the statute be construed, if reasonably possible, so as to avoid a conflict—a familiar principle of statutory construction—but the Ohio Constitution, also, must be construed, if it is reasonably possible to do so, to avoid a conflict with the statute. We reject this notion.

{¶ 9} The Constitution of Ohio, including, of course, Section 11, Article XV, is the supreme law of this state, subordinate only to the Constitution of the United States and the laws of the United States enacted consistently with the federal constitution. The provisions of the Constitution of Ohio may not be required to defer to statutory law, whether directly or indirectly through the mechanism of deferential construction.

{¶ 10} The notion that two provisions of law should be construed, if reasonably possible, to avoid conflicting with one another is the principle of in

pari materia: two laws on the same subject matter must be construed with reference to each other. Black's Law Dictionary (8th Ed.Rev.2004) 807. Had the citizens of Ohio, in adopting the provisions of the Defense of Marriage Amendment, wished those provisions to be in pari materia with the statutory law of Ohio, to be construed with reference to other statutory law, they could have enacted those provisions as ordinary law, using the provisions in Section 1b, Article II for the enactment of ordinary law by means of an initiative petition. They did not do so; to the contrary, the measure was proposed by initiative petition as an amendment to the Constitution and was adopted as part of the Ohio Constitution. It is no more appropriate to construe the provisions of the Defense of Marriage Amendment deferentially to existing statutes than it would be to construe the provisions of Section 11, Article I, for freedom of speech and of the press in a manner deferential to statutory law.

{¶ 11} Our first task is to determine the meaning of Section 11, Article XV, the Defense of Marriage Amendment, and only then to determine whether the provision of the domestic-violence statute upon which the state relies violates the Ohio Constitution.

{¶ 12} The state cites *State ex rel. Lake Cty. Bd. of Commrs. v. Zupancic* (1991), 62 Ohio St.3d 297, 303, 581 N.E.2d 1086, for the proposition that "Ohio courts presume the body enacting the [constitutional] amendment is aware of existing constitutional and statutory provisions and their judicial construction," and then suggests that had the electorate, in adopting the Defense of Marriage Amendment, intended to effectively repeal certain specific statutory provisions, including the "person living as a spouse" provision in R.C. 2919.25(F)(1)(a)(i), the proposed amendment submitted to the electors for adoption would have said so. The citation to *Zupancic* is from the dissenting opinion. The majority opinion rejected this analysis, preferring the "long-standing rule of construction mandat[ing] that we consider the common and ordinary meaning of the terms contained within our Constitution in order to interpret them properly." Id. at 300, 581 N.E.2d 1086. And in *State ex rel. Rose v. Donahey* (1919), 100 Ohio St. 104, 125 N.E. 908, a case cited by the American Civil Liberties Union of Ohio Foundation, the Supreme Court recognized that the adoption of an amendment to the Ohio Constitution may implicitly have the effect of repealing various statutes that are in conflict with the newly adopted amendment.

{¶ 13} In *State v. Rodgers,* 131 Ohio Misc.2d 1, 2005-Ohio-1730, 827 N.E.2d 872, another case cited by the American Civil Liberties Union of Ohio Foundation, *State ex rel. Smead v. Union Twp.* (1858), 8 Ohio St. 394, 399, 1858 WL 30, is cited for the following proposition: "If any reasonable construction may be given to each [a statute and a constitutional provision], so that both may stand, such construction must be given." The quote is accurate, but the words are dictum.

In that case, the issue was whether a bond issue authorized by the General Assembly before the adoption of the Ohio Constitution of 1851 could survive the following provision in that constitution:

{¶ 14} "The general assembly shall never authorize any county, town, or township, by vote of its citizens or otherwise, to become a stockholder in any joint stock company, corporation, or association whatsoever, or to raise money for, or loan its credit to, or in aid of, any such company, or corporation, or association."

{¶ 15} The Supreme Court held that the above-quoted provision prohibited the General Assembly from enacting laws authorizing bond issues in the future, but did not prevent laws previously enacted from having effect. In reaching this conclusion, it was aided by Section 1 of the schedule in the new Constitution, which provided that "all laws of this state in force on the first day of September, 1851, not inconsistent with this constitution, shall continue in force until amended or repealed." The court then articulated the principle, quoted above, that both the Constitution and a statute must be construed, if possible, so as to avoid a conflict, but went on to observe:

{¶ 16} "But in this case there is no inconsistency in the language of the acts of assembly and the provision of the constitution under consideration. The provision of the constitution is prospective in its terms." Id. at 400.

{¶ 17} In short, the court in *State ex rel. Smead v. Union Twp.* did exactly what we propose to do herein: it first construed the Constitution, and then determined whether the statutory enactment before it offended the Constitution. It did observe that ambiguous language in both the Constitution and a statute should be construed, if possible, to avoid a conflict, but this observation was gratuitous—the court found no ambiguity in the constitutional provision it was considering.

{¶ 18} The Defense of Marriage Amendment is no less a part of the fundamental, organic law of Ohio by reason of its recent vintage; if anything, it is entitled to even greater deference. By definition, an amendment to the Ohio Constitution, once adopted, supersedes any preexisting provisions of the Constitution. In stating this obvious fact, we make no observations concerning the wisdom of the electorate in having adopted the amendment. Our sworn obligation to uphold the Constitution of Ohio is not limited or qualified in any way based upon our assessment of its merits.

### Construction of the Defense of Marriage Amendment

{¶ 19} In 2004, there was a popular concern in many parts of the country that the traditional concept of marriage as a relationship between a man and a woman having legal, cultural, and spiritual significance was under attack. Courts in one state, Massachusetts, had held unconstitutional a law restricting marriage

to a union between a man and a woman. Local officials in a number of states were officiating at, or at least purporting to officiate at, marriages between same-sex partners. The response in many states, including Ohio, was the circulation of initiative petitions to enact laws, by popular vote, combating these trends. In Ohio, the result was the adoption, by popular vote following an initiative petition, of Section 11, Article XV, of the Ohio Constitution—the Defense of Marriage Amendment. In its entirety, Section 11, Article XV, is as follows:

{¶ 20} "Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions. This state and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance or effect of marriage."

{¶ 21} As a preliminary matter, it should be noted that Section 11, Article XV, is not addressed to prospective legislative enactments by the General Assembly. This distinguishes it from the provision in the Constitution of 1851 under consideration in *State ex rel. Smead v. Union Twp.*

{¶ 22} The first sentence of Section 11, Article XV, is straightforward enough. Marriage in Ohio is to be restricted to a relationship between one man and one woman. Same-sex marriages are not permitted; neither is polygamy or polyandry. Nor will a same-sex marriage undertaken in another state, where same-sex marriages might be legal, be recognized in Ohio.

{¶ 23} The second sentence of the amendment is much broader. It appears to be an attempt to prevent the legal recognition of quasi-marital relationships for the purpose of approximating the design, qualities, significance, *or* effect of marriage. In our view, the words "design," "qualities," "significance," and "effect" are broad concepts, and the fact that they are listed in the disjunctive is significant.

{¶ 24} The deep issue in this appeal is whether a statute giving one effect of a de jure marriage—the protection afforded a spouse from domestic violence by the other spouse—to a de facto marital relationship runs afoul of the amendment, or whether it, or other statutes or laws, would be required to give all of the effects of marriage to a quasi-marital relationship before running afoul of the amendment. In our view, the only reasonable interpretation of the second sentence of the amendment is the former.

{¶ 25} Let us suppose that the amendment were given the more restrictive interpretation. To begin with, it is difficult to imagine any act by the state of Ohio, or any of its political subdivisions, that would, in fact, give all of the effects of marriage to a quasi-marital relationship. Secondly, the evident purpose behind the second sentence of the amendment—to prohibit the indirect recogni-

tion of nontraditional marriages—could die the death by a thousand cuts. Imagine the adoption of a testimonial privilege for quasi-spouses, the addition of quasi-spouses alongside spouses and children as beneficiaries in wrongful-death actions, the addition of quasi-spouses to the class of family members who can recover for loss of consortium, or the addition of a quasi-spouse to the list of persons who must be notified of a woman's intention to have an abortion. The list is endless. At what point would the second sentence of the amendment be deemed to have been violated? Would only the last in the series of legislative enactments, common-law rulings, and administrative or judicial rule-making be voided for unconstitutionality?

{¶ 26} Suppose that, after a long series of legal struggles to enhance the rights of nontraditional quasi-spouses, the only remaining point of difference in Ohio between a spouse and a quasi-spouse were that the spouse, but not the quasi-spouse, could claim an additional $25 credit on the Ohio income tax? Would that avoid implicating the second sentence of the amendment because actual spouses and quasi-spouses are not treated identically for all legal purposes in Ohio? Suppose the city of Xenia gave an actual spouse, but not a quasi-spouse, a $25 credit on its municipal-income tax, but no other taxing authority in Ohio made this distinction, and there were no other differences in Ohio between the legal effect of an actual marital relationship and a quasi-marital relationship?

{¶ 27} In our view, the jurisprudence contemplated by the hypotheticals recited above would be unworkable. The general principle evident in the second sentence to the Defense of Marriage amendment is that a legal status of a de facto marital relationship shall neither be created nor recognized in Ohio as having the same effect as the legal status of a de jure marital relationship. It is tempting to speculate which potential exceptions to this general principle would have found favor with a majority of the Ohioans who voted for the Defense of Marriage Amendment, but this would be mere speculation. In our view, the second sentence was intended to avoid the prospect of the Ohio General Assembly, or the Ohio courts, establishing exceptions to its reach. In this connection, it is useful to remember that the Defense of Marriage Amendment was proposed and adopted amidst concerns that the concept of traditional marriage was being eroded by judicial rulings, among other factors.

Does the "Person Living As a Spouse" Provision Violate the Amendment?

{¶ 28} It remains to be determined whether the provision in R.C. 2919.25(F)(1)(a)(i) extending the protection afforded by the domestic-violence statute to "a person living as a spouse" violates the Defense of Marriage amendment. "A person living as a spouse" is defined, in R.C. 2919.25(F)(2), as follows:

{¶ 29} " 'Person living as a spouse' means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question."

{¶ 30} "Cohabitation," for purposes of the statute, has been defined as follows:

{¶ 31} "(1) sharing of familial or financial responsibilities and (2) consortium. * * * Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations." *State v. Williams* (1997), 79 Ohio St.3d 459, 465, 683 N.E.2d 1126.

{¶ 32} This definition could serve just as readily as a definition of the marital relationship. Both cohabitation, as defined above, and the marital relationship encompass a myriad of possible individual attributes—no two relationships of either type are exactly alike—but they all involve some combination of the attributes listed in the above-quoted passage.

{¶ 33} In our view, a "person living as a spouse," for purposes of the domestic-violence statute, is the sort of quasi-marital relationship that the Defense of Marriage Amendment was concerned with.

{¶ 34} The state objects that the domestic-violence statute does not merely extend its protection to quasi-spouses, but also to children and former spouses. We view this as a non sequitur. The alleged victim in this case is within the protection of the statute solely by reason of his status as a "person living as a spouse." The fact that there are other relationships within the scope of the protection afforded by the statute is immaterial. If the alleged victim also had one of those other relationships with the offender, there would be no problem— the alleged offense could be prosecuted on the basis of that other relationship, the relationship of former spouse, for example.

{¶ 35} This suggests one way in which the statute might be amended to avoid running afoul of the Defense of Marriage amendment. If the protections afforded by the statute were extended to all persons sharing residential quarters, that would present no constitutional problem, because an alleged victim who happens to be a quasi-spouse would be accorded the protection of the domestic-violence statute, not by reason of being a quasi-spouse, but by reason of sharing the residence. Similarly, a quasi-spouse can enjoy the protections of the assault statutes, not by reason of being a quasi-spouse of the offender, but merely because he or she is a human being, entitled as a human being to protection by

the criminal assault statutes from assaults by any other human being. Extending the protections afforded by the domestic-violence statute to all persons sharing residential quarters would obviously constitute an expansion of the statute, and whether that would be desirable is for the General Assembly to determine, not this court, but it is a possible solution that the General Assembly may wish to consider for the constitutional problem.

{¶ 36} We conclude that the "person living as a spouse" provision of the domestic-violence statute, R.C. 2919.25(F)(1)(a)(i), does violate the Defense of Marriage Amendment. The state's sole assignment of error is overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

BROGAN, J., concurs.

DONOVAN, Judge, dissenting.

{¶ 37} I disagree. The sole assignment of error raised by this appeal is whether the trial court erred as a matter of law when it declared R.C. 2919.25 unconstitutional as it relates to cohabiting partners, pursuant to the Defense of Marriage Amendment ("DOMA").

{¶ 38} The majority correctly notes that our first task is to determine the meaning of the DOMA, and second (indeed, only then) whether the provisions of the domestic-violence statute upon which the state relies violates the Ohio Constitution; hence, accurate interpretation is vital. The majority's approach, however, is the rhetorical equivalent of a building inspector knocking a house off its foundation and "only then" declaring the structure unsound.

{¶ 39} I agree with the majority that the first sentence of DOMA is "straight-forward." However, I disagree with the majority's analysis that the second sentence of the DOMA attempts to prevent the legal recognition of "quasi-marital relationships." Indeed, the fact that the majority writes that the second sentence "appears to attempt to prevent the legal recognition of quasi-marital relation-ships" admits to the role of speculation and conjecture in its approach. What is a "quasi-marital relationship" or a "quasi-spouse?" These are not defined legal terms in the state of Ohio and probably would be as incapable of definition as quasi-marriage proposals, quasi-pregnancies and quasi-divorces. The reasonable interpretation of the second sentence, which takes into account the history of the DOMA, mandates it be read in conjunction with the first sentence to prevent the enactment of any laws that recognize/create unions between same-sex individuals that are the formal/legal equivalent of a traditional marriage. This interpretation of the second sentence of the DOMA recognizes that "[w]here provisions of the Constitution address the same subject matter, they must be read in pari materia

and harmonized if possible." *State ex rel. Toledo v. Lucas Cty. Bd. of Elections* (2002), 95 Ohio St.3d 73, 78, 765 N.E.2d 854. The second sentence should be read to buttress the narrow legal definition of marriage set out in the first sentence of the DOMA. The object and operative term of the second sentence of the DOMA is the general term "legal status." The textual canon of interpretation ejusdem generis calls for interpreting a general term in harmony with the class of objects reflected in more specific terms accompanying it. See, generally, *State v. Kuns* (1967), 10 Ohio St.2d 1, 39 O.O.2d 1, 225 N.E.2d 226. Specific terms appear in the first sentence of the amendment defining marriage as "a union between one man and one woman." The term "legal status," therefore, relates to a union between one man and one woman, and the second sentence merely prohibits recognizing a marriage of two or more persons other than one man and one woman. A broader reading would render one man/one woman entirely superfluous.

{¶ 40} "In the interpretation of an amendment to the Constitution the object of the people in adopting it should be given effect; the polestar in the construction of the constitutional, as well as legislative, provision is the intention of the makers and adopters thereof." *Castleberry v. Evatt* (1946), 147 Ohio St. 30, 33 O.O. 197, 67 N.E.2d 861, paragraph one of the syllabus. During the 2004 presidential election year, 11 states, including Ohio, placed an amendment called the Defense of Marriage Amendment on the ballot. Commonly known as Issue I, its purpose was, as the majority notes, "straightforward enough." Its clear purpose was to prevent persons of the same sex from entering a lawful marriage. It is the duty of the court, and its only proper purpose in the construction of constitutional provisions, to ascertain and give effect to the intent of the people. *Hupp v. Hock-Hocking Oil & Natural Gas Co.*, 88 Ohio St. 61, 101 N.E. 1053, syllabus. The sovereign voice of the people is clear in Section 11, Article XV, of the Ohio Constitution.

{¶ 41} Proceeding with the proposition that the DOMA limits legal marriage to one man, one woman, I turn to whether the term "living as a spouse" under R.C. 2919.25 creates a "legal status" that the DOMA forbids.

{¶ 42} It is without question that the domestic-violence statute enacted over two decades ago was designed to protect "family or household members" from violence within the home, violence that arises out of the nature of the relationship between the victim and the perpetrator. Whether the victim is "living as a spouse" with the offender is left to the parties to define privately and the jury to discern factually. "Legal status" is achieved only by some legal action; "living as a spouse" requires no legal action.

{¶ 43} A person "living as a spouse" is a family or household member, an element under R.C. 2919.25. The domestic-violence law classifies and/or categor-

izes victims who are within its purview. A thorough review of case law prior to the amendment's enactment failed to reveal a single case that referred to the category of victims "living as a spouse" as a legal status. "Legal status" is not defined anywhere in the criminal code, nor would anyone expect it to be. Criminal sections proscribe conduct and classify victims, but such classifications or categories are not akin to the "legal status" afforded an "invitee," for example in a premises-liability case. Such a "legal status" as "invitee" within the context of civil law defines not only rights but concomitant duties and/or obligations. The "legal status" of a person is ultimately a question of law and not a question of fact. Yet clearly the fact-finder must determine in a domestic-violence case whether an individual is living or functioning as a spouse in order to fall within the category of a family or household member. It is necessarily a question of fact. *Williams* pronounced that the determination of cohabitation requires a case-by-case analysis by the trier of fact.

{¶ 44} The phrase "living as a spouse" does not confer a "legal status," but rather describes a setting and a series of circumstances particular to a relationship wherein criminal harm has been alleged. The phrase assists the fact-finder, who must determine whether the unique circumstances surrounding a victim/offender relationship meet the element of "family or household member." Since the description "living as a spouse" encompasses a larger segment of couples other than just individuals "living as spouses" and also includes "cohabitors," are we suggesting that the "legal status" the state purportedly recognizes includes "cohabitors"? See *State v. Hammond*, 1996 WL 748272 (Ohio App. 2 Dist.), and *State v. Yaden* (1997), 118 Ohio App.3d 410, 692 N.E.2d 1097. It is illogical to conclude that a person "living as a spouse" and/or cohabitating somehow is elevated to the position of a state-sanctioned marriage. Certainly, such a relationship is not in contravention of a ban on same-sex marriage or polygamy or polyandry.

{¶ 45} I would hold that the domestic violence law is constitutional and may coexist in harmony with Section 11, Article XV, of the Ohio Constitution. In fact, there is agreement among the Fifth, Seventh, Ninth and 12th appellate districts that Section 11, Article XV, of the Ohio Constitution does not render R.C. 2919.25 unconstitutional. See, e.g., *State v. Newell*, Stark App. No. 2004CA00264, 2005-Ohio-2848, 2005 WL 1364937, ¶ 43; *State v. Rexroad*, Columbiana App. Nos. 05 CO 36, 05 CO 52, 2005-Ohio-6790, 2005 WL 3489726, ¶ 35; *State v. Nixon*, 165 Ohio App.3d 178, 2006-Ohio-72, 845 N.E.2d 544; *State v. Carswell*, Warren App. No. CA2005–04–047, 2005-Ohio-6547, 2005 WL 3358882, ¶ 20–21.

{¶ 46} I would reverse the trial court's judgment and reinstate the indictment.